L. R. WILLSON & SONS, INC., Petitioner,

v.

Raymond L. DONOVAN, Secretary of Labor, United States Department of Labor, Respondent.

No. 81–1603.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 26, 1982.

Decided Aug. 13, 1982.

Gary Z. Nothstein, Baltimore, Md., with whom Jeffrey P. Ayres and Ezra D. Singer, Baltimore, Md., were on brief, for petitioner.

Andrea Casson, Atty., U. S. Dept. of Labor, Washington, D. C., of the bar of the Supreme Court of Florida, pro hac vice, by special leave of court, with whom Allen H. Feldman, Atty., U. S. Dept. of Labor, Washington, D. C., was on brief, for respondent.

John A. Bryson, Westminster, Md., and Shelley D. Hayes, Attys., U. S. Dept. of Labor, Washington, D. C., also entered appearances for respondent.

Before TAMM and WILKEY Circuit Judges, and GERHARD A. GESELL,* United States District Judge for the District of Columbia.

Opinion for the court filed by Circuit Judge TAMM.

TAMM, Circuit Judge:

We are required in this case to plunge into the world of Occupational Safety and Health Administration (OSHA) safety standards for the construction industry in general and the structural steel erection industry in particular. The standards at issue set forth the protections employers are required to provide to minimize the hazard to employees of falling from the buildings upon which they work. The employer in this case, L. R. Willson & Sons, Inc. (Willson), was cited for two violations of the Occupational Safety and Health Act of 1970 (the Act), 29 U.S.C. §§ 651–78 (1976). With regard to the citation for a "willful" violation of the Act, we reverse; we find

* Sitting by designation pursuant to 28 U.S.C. § 292(a) (1976).

that one of the standards involved is ambiguous and that the record lacks substantial evidence to support the violation. The standard upon which the citation for a "serious" violation was premised, however, sets forth clearly the requirements imposed upon employers. As there is substantial evidence in the record to support a finding of violation, we affirm with respect to the second citation.

I.

In 1970 Congress enacted the Occupational Safety and Health Act "to assure so far as possible every working man and woman in the Nation safe and healthful working conditions ...." 29 U.S.C. § 651(b). As one means of achieving this goal, Congress authorized the Secretary of Labor (the Secretary) "to set mandatory occupational safety and health standards applicable to businesses affecting interstate commerce." Id. at § 651(b)(3). In addition, the Occupational Safety and Health Review Commission (the Commission) was created to carry out "adjudicatory functions under [the Act] ...." Id. The Act imposes an affirmative duty on each employer to "furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees ... [and to] comply with occupational safety and health standards promulgated under this chapter." Id. at § 654(a).

■ Following an "inspection or investigation," if the Secretary believes that the requirements of section 654, of any promul-

gated standard, or of any prescribed regulation have been violated, "[he] shall with reasonable promptness issue a citation to the employer." Id. at § 658(a). Under section 666 of the Act, civil and criminal penalties may be assessed for any such violation. The nature and severity of the penalty imposed will depend, as a general matter, upon whether the violation is willful, serious, or repeated.[1] A willful violation, committed after a first conviction, that results in the death of any employee draws the most severe penalty—"a fine of not more than $20,000 or ... imprisonment for not more than one year, or ... both." Id. at § 666(e).

Pursuant to his statutory authority, the Secretary has promulgated literally hundreds of regulations and standards to govern innumerable safety and health considerations. The present case concerns Part 1926, "Safety and Health Regulations for Construction," 29 C.F.R. §§ 1926.1–1926.1051 (1981).[2] With this remedial, regulatory, and enforcement scheme as a backdrop, we turn to the facts of the case at bar.

II.

In mid-February 1980, two OSHA compliance officers paid a visit to the worksite of petitioner L. R. Willson & Sons, Inc., in Vienna, Virginia. At that time, Willson had erected to the fourth floor level the structural steel for a nine level office building, the ninth level being the roof. Willson was the only contractor engaged in steel erection at that site. The compliance officers spoke with James Willson, Vice Presi-

---

1. A willful violation is one done with an "intentional disregard of, or plain indifference to, OSHA regulations ...." Cedar Constr. Co. v. OSHRC, 587 F.2d 1303, 1305 (D.C.Cir.1978).

 A serious violation is defined in the Occupational Safety and Health Act of 1970 (the Act), 29 U.S.C. §§ 651–78 (1976), as one where, as a result of an existing condition or practice, "there is a substantial probability that death or serious physical harm could result ... unless the employer did not, and could not with the exercise of reasonable diligence, know of the presence of the violation." 29 U.S.C. § 666(j).

 A repeated violation occurs when the employer has been cited for the same violation on

prior occasions. See, e.g., Bunge Corp. v. Secretary of Labor, 638 F.2d 831, 837 (5th Cir. 1981).

2. Part 1926, 29 C.F.R. §§ 1926.1–1926.1051 (1981) is divided into twenty-four subparts, lettered A through X. This case concerns safety standards contained in three subparts: Subpart C, entitled "General Safety and Health Provisions," id. at §§ 1926.20–1926.32; Subpart E, entitled "Personal Protective and Life Saving Equipment," id. at §§ 1926.100–1926.107; and Subpart R, entitled "Steel Erection," id. at §§ 1926.750–1926.752.

dent and Safety Director for the company, concerning the absence of safety nets at the site. Mr. Willson explained that his employees were protected from falls by wearing safety belts and lanyards, and by "tieing off" at all times and all places.[3]

On March 24, 1980, one of the compliance officers returned to the Willson worksite to conduct a follow-up visit. The officer observed several Willson employees on the seventh, eighth, and ninth levels. None of these employees was using a safety belt, nor were perimeter safety nets in use. On the basis of these observations, the compliance officers concluded that at least one Willson employee, the one on the ninth level, was exposed to an *exterior* fall hazard of approximately 109 feet. In addition, the compliance officer observed that there was neither an interior safety net nor a temporary floor above the sixth floor level. The officer therefore concluded that Willson's employees were also exposed to an *interior* fall hazard of approximately thirty-three feet, from the ninth to the sixth floor level below.

These observations led to the issuance by the Secretary of two citations, one for failure to protect against the exterior fall hazard and the other for failure to provide interior fall protection. Willson timely contested the citations, and a hearing was held before an administrative law judge (ALJ), who affirmed the Secretary. *L. R. Willson & Sons, Inc.*, OSHRC Docket No. 80-2760 (Mar. 17, 1981) [hereinafter *ALJ Decision*], Joint Appendix (J.A.) at 198–217. Follow-

ing that decision, Willson petitioned the Commission for discretionary review. No Commissioner directed review, however, and the ALJ's decision became a final order of the Commission by operation of law. 29 U.S.C. § 661(i). Willson's petition for review of the Commission's final order is now before this court pursuant to 29 U.S.C. § 660(a).

## III.

### A. THE "WILLFUL" VIOLATION

Willson was cited for failure to protect adequately against an exterior fall hazard and was charged with a willful violation of OSHA standards 1926.28(a) and 1926.-105(a).[4] The citation provided:

> 29 CFR 1926.28(a) and 1926.105(a): Employee(s) were not protected against falls of more than 25 feet by the use of safety nets, ladders, scaffolds, catch platforms, temporary floors, safety lines, safety belts, or other appropriate personal protective equipment:
>
> (a) Ninth level, south side of building, approximately 109 feet above the ground—employees were checking connections and re-tightening bolts by hand, on 3/24/80.

Citation and Notification of Penalty, J. A. at 1.

Willson challenges the validity of this citation on three major grounds. Initially, Willson claims that the cited standards are not applicable to the steel erection industry. This argument is premised on two distinct

---

3. The regulations define a "safety belt" as "a device, usually worn around the waist which, by reason of its attachment to a lanyard and lifeline or a structure, will prevent a worker from falling." 29 C.F.R. § 1926.107(f). A "lanyard" is "a rope, . . . [o]ne end [of which] is fastened to a safety belt . . . and the other end is secured to a substantial object or a safety line." *Id.* at § 1926.107(b).

"Tieing off" is presumably securing the lanyard to a substantial object or safety line. For simplicity, we will at times refer to this means of fall protection as "using safety belts."

4. Section 1926.28(a) provides:

Personal protective equipment.

(a) The employer is responsible for requiring the wearing of appropriate personal protective equipment in all operations where there is an exposure to hazardous conditions or where this part indicates the need for using such equipment to reduce the hazards to the employees.

29 C.F.R. § 1926.28(a).

Section 1926.105(a) provides:

Safety nets.

(a) Safety nets shall be provided when workplaces are more than 25 feet above the ground or water surface, or other surfaces where the use of ladders, scaffolds, catch platforms, temporary floors, safety lines, or safety belts is impractical.

29 C.F.R. § 1926.105(a).

claims: first, that Subpart R of Part 1926 of the Secretary's regulations provides the exclusive source of safety standards applicable to the steel erection industry, and, second, that if the general safety standards contained in Subparts C and E normally apply to the steel erection industry, they do not apply under the circumstances of this case because they are preempted by a specific steel erection standard. Assuming the cited standards are applicable to steel erectors, Willson contends that the safety belt violation under section 1926.28(a) is not supported by substantial evidence. In addition, petitioner claims that section 1926.105(a) is vague and does not provide employers with adequate notice that safety nets are required. We address each of these contentions in turn.[5]

1. Preemption

a. *Subpart R does not provide the exclusive source of standards for the steel erection industry.*

Willson's first line of attack on the citation for a "willful" violation consists of the assertion that a steel erection firm is required to comply only with the standards governing steel erection set forth in Subpart R of Part 1926 and not with the health and safety standards that apply generally to the construction industry, including Subparts C and E, which contain the standards under which Willson was cited. This argument is supported, Willson argues, by Commission precedent, by court decisions, and

by the Secretary's regulation that governs the applicability of all standards, 29 C.F.R. § 1910.5(c).[6] We disagree.

A specific standard preempts a general one only if "a condition, practice, means, method, operation, or process" is already dealt with by a specific standard. 29 C.F.R. § 1910.5(c)(1). The words of the regulation evince no intent that the general standards be preempted for an entire industry simply because *some* specific standards for that industry have been promulgated. In fact, the regulations provide expressly to the contrary. *Id.* at § 1910.5(c)(2). We think it clear from the plain language employed in section 1910.5(c) that the general standards apply to all hazards native to the steel erection industry unless a specific standard in Subpart R sets forth a different mandatory or preferred method for protecting against the particular hazard in question.

The Commission decisions and the court cases upon which petitioner relies are inapposite.[7] Each case determined only that on the facts of the case a specific standard in Subpart R preempted the general standard. For example, Willson cites *McLean-Behm Steel Erectors, Inc.*, OSHRC No. 15582, 6 OSHC (BNA) 2081 (1978), *aff'd*, 608 F.2d 580 (5th Cir. 1979), for the proposition that the Commission has "held that the standards found in 29 CFR 1926.750 are specifically applicable to steel erection ..., thus preempting the application of 29 CFR 1926.-28(a) and .105(a)." Brief for Petitioner at 23. The Commission did not, however,

**5.** Willson also claims that the administrative law judge improperly relied on inadmissible hearsay evidence and that the citation was improperly characterized as willful. Our resolution of this case, however, makes it unnecessary for us to reach these contentions.

**6.** Section 1910.5 of the regulations, which is entitled "Applicability of Standards," provides, in part, as follows:

(c)(1) If a particular standard is specifically applicable to a condition, practice, means, method, operation, or process, it shall prevail over any different general standard which might otherwise be applicable to the same condition, practice, means, method, operation, or process....

(c)(2) On the other hand, any standard shall apply according to its terms to any employment and place of employment in any industry, even though particular standards are also prescribed for the industry ... to the extent that none of such particular standards applies....
29 C.F.R. § 1910.5(c).

**7.** We note that Willson and the Secretary each rely on the court's affirmance of the Commission's decision in Havens Steel Co., OSHRC No. 13463, 6 OSHC (BNA) 1564 (1978). *See* Brief for Petitioner at 24 n.14; Brief for Respondent at 31. Rule 8(f) of the General Rules of this court provides that "[u]npublished orders ... are not to be cited in briefs or memoranda of counsel as precedents."

make the broad industry preemption finding that Willson implies it did. Rather, the Commission found that "the standard more specifically applicable *to the facts of this case* is 1926.750(b)(1)(ii). 6 OSHC at 2083 (emphasis added).

The only court to our knowledge that has addressed the broad preemption proposition espoused by Willson has rejected it. *Bristol Steel & Iron Works, Inc. v. OSHRC*, 601 F.2d 717 (4th Cir. 1979), involved the question whether an employer violated section 1926.28(a)[8] by failing to require that its employees wear safety belts and life lines to protect against a fall of sixteen feet, from the second floor level of a multi-level structure, to the ground below. The employer argued that Subpart R provided the exclusive source of fall protection standards for the steel erection industry. The *Bristol Steel* court found that the general safety standards effectuate the purposes of the Act because they "fill those interstices necessarily remaining after the promulgation of specific safety standards." 601 F.2d at 721 (footnote omitted). In addition the court noted that "[i]t would be utterly unreasonable to expect the Secretary to promulgate specific safety standards which would protect employees from every conceivable hazardous condition." *Id.* at 721 n.11. Although we express no opinion as to the correctness of the *Bristol Steel* decision,[9] we believe that the court there analyzed the industry preemption issue properly. A general standard is not preempted unless a specific standard sets forth the measures that an employer must take to protect employees from a particular hazard.

Accordingly, although we hold that there is no industry-wide preemption, we must determine whether the exterior fall hazard at issue in this case is addressed in the specific steel standards.

b. *Which standards apply to exterior fall hazards in the structural steel erection industry?*

Willson contends that a specific steel standard, section .750(b)(1)(ii),[10] provides the protection requirements for both interior and exterior falls and thereby preempts the application of sections .28(a) and .105(a). The Secretary, on the other hand, contends that although section .105(a) covers interior *and* exterior fall hazards, section .750(b)(1)(ii) applies only to interior falls, and, accordingly, the 109-foot exterior fall hazard observed at petitioner's worksite could be cited properly only under section .105(a). The ALJ agreed with the Secretary's interpretation and found that

Although 1926.750(b)(1)(ii) speaks to a requirement to erect *interior* safety nets where structures are not adaptable to temporary floors mandated by 1926.-750(b)(1)(i), these Steel Erection Standards are silent as to *exterior*, perimeter safety nets.

*ALJ Decision* at 13, J.A. at 211.

In support of its position, petitioner cites *McLean-Behm Steel Erectors, Inc. v. OSHRC*, 608 F.2d 580 (5th Cir. 1979). *McLean-Behm* involved an OSHA citation for failure to provide fall protection by means of personal protective equipment pursuant to section .28(a). The employer there argued that a more specific standard,

---

8. All subsequent references to the Secretary's regulations will be to those found in Part 1926 unless otherwise noted. Thus, we will refer to 29 C.F.R. § 1926.28(a) simply as section .28(a).

9. The *Bristol Steel* court also found that under the facts of that case section .28(a) was not preempted by a specific steel standard which arguably addressed the same hazard. A petition for review that raises the same narrow preemption issue and presents a factual situation very similar to that involved in *Bristol Steel* is currently pending before this court. *See L. R. Willson & Sons, Inc. v. Donovan*, No. 81-2101 (D.C.Cir., filed Oct. 14, 1981).

10. Section .750(b)(1)(ii) provides:

(b) *Temporary flooring—skeleton steel construction in tiered buildings.*

(1)(ii) On buildings or structures not adaptable to temporary floors, and where scaffolds are not used, safety nets shall be installed and maintained whenever the potential fall distance exceeds two stories or 25 feet. The nets shall be hung with sufficient clearance to prevent contacts with the surface of structures below.

29 C.F.R. § 1926.750(b)(1)(ii).

section .750(b)(1)(ii),[11] which requires safety nets where temporary flooring cannot be used, governed the fall hazard in question. In dicta, the court agreed that *under the circumstances of that case,* section .750(b)(1)(ii) superseded section .28(a). 608 F.2d at 581. The case turned, however, on whether the *sua sponte* amendment of the citation by the ALJ violated "[e]lemental fairness [by] depriving [the employer] of its right to present defenses to the charge against it." *Id.* at 582 (footnote omitted).[12] The *McLean-Behm* court did not discuss the fall hazard at issue in terms of an interior-exterior dichotomy. The facts underlying the citation show, however, that the fall was an interior one; the employees were "exposed to falling about 30 feet to [a] concrete floor." [13]

Petitioner also relies on *Builders Steel Co. v. Marshall,* 622 F.2d 367 (8th Cir. 1980), for the proposition that in *all* cases section .750(b)(2)(i),[14] a structural steel rule requiring temporary flooring, supersedes section .105(a). In that case, however, the citation was issued under section .105(a) on the premise that section .750(b)(2)(i) applied only to multi-storied structures and not to single-story structures, one of which was the subject of the citation. In *Builders Steel,* it was apparently assumed that the particular fall hazard in question was covered by *both* section .750(b)(2)(i) and section .105(a), so that if section .750(b)(2)(i) applied to single-story structures, the requirements of section .105(a) were inapplicable. The fall hazard involved in that case also appears to have been an interior one, "a fall of over twenty-five feet to a concrete *floor* below . . . ." *Builders Steel,* 622 F.2d at 665 (emphasis added). No mention was made of an exterior fall hazard or what protective devices, if any, were employed. *Builders Steel* turned solely on the applicability of section .750(b)(2)(i) to single-story steel structures—an issue not present in the instant case.[15]

Section .750(b)(1)(ii) mentions only temporary flooring, scaffolds, and safety nets as fall protection devices.[16] In theory at least, section .750(b)(1)(ii) could be read to require temporary flooring (in accordance with section .750(b)(2)(i)) to protect against *interior* falls and scaffolds to protect against *exterior* falls. Under this view, where there are no temporary floors and no

---

**11.** *See supra* note 10.

**12.** Petitioner also relies on *McLean-Behm* for the proposition that the Secretary of Labor (the Secretary) recognized the inapplicability of the general standards to steel erection by attempting to amend the citation to a violation of a Subpart R specific standard. Reply Brief for Petitioner at 5 n.4. Petitioner misrepresents the case. In *McLean-Behm* the court noted that "[t]he Secretary expressly declined to move for the citation's amendment . . .," 608 F.2d at 581, and that "[a]lthough asked at the hearing whether an amendment would be appropriate, counsel for the Secretary specifically declined to make such a request." *Id.* at 582. Thus, contrary to Willson's assertions, *McLean-Behm* supports a finding that the Secretary has been consistent in his position that section .28(a) applies to the steel erection industry.

**13.** McLean-Behm Steel Erectors, Inc., OSHRC No. 15582 (1978) (ALJ decision).

**14.** Section .750(b)(2)(i) provides in part:
(2)(i) Where skeleton steel erection is being done, a tightly planked and substantial floor shall be maintained within two stories or 30 feet, whichever is less, below and directly

under that portion of each tier of beams on which any work is being performed . . . . 29 C.F.R. § 1926.750(b)(2)(i).

**15.** In *Builders Steel,* the Secretary was unable to provide *any* basis for his interpretation and in fact conceded that the construction methods employed in a single-story building and the first story of a multi-storied building are identical and that the concomitant fall hazard is identical. *See* 622 F.2d at 369. The two regulations, however, are not identical. Section .105(a) requires fall protection if the fall distance is twenty-five or more feet, and section .750(b)(2)(i) requires temporary floors (or nets) if the fall distance is thirty feet or more. If section .750 applied, Builders Steel was not in violation, the fall hazard for which it was cited being twenty-nine feet, seven and one-half inches.

**16.** Scaffolds are apparently not used as fall protection devices in the same sense as temporary floors or nets. The floors and nets clearly are intended to be in place below the workers to break the fall. Scaffolds, on the other hand, are apparently intended to be erected to provide the work surface on which the workers will stand.

scaffolds in use, the requirement that "safety nets shall be installed" presumably would mean both interior and perimeter nets to provide protection for both types of falls. Such an interpretation is untenable, however, because section .750(b)(1)(ii) apparently requires an absence of both temporary floors *and* scaffolds before requiring nets. The standard appears simply to list the methods of interior fall protection in the order of preference: temporary floors, scaffolds, and, finally, safety nets.

In any event, by the express terms of the standard, safety nets are required only if temporary flooring cannot be used *and* scaffolds are not in use. Thus, it is clear that an employer is in complete compliance with sections .750(b)(2)(i) and .750(b)(1)(ii) if temporary floors are maintained at the levels required in those sections. Accordingly, it appears obvious that temporary flooring protects only against *interior* falls; the standards do not require that such flooring extend beyond the perimeter of the structure.[17]

Despite this common sense view of the Subpart R standards, Willson argues that the general standards are preempted because section .750(b)(1)(ii) contemplates exterior fall protection. In support of this

assertion, Willson argues that if safety nets are required by section .750(b)(1)(ii), then the requirements of section .105(c)(1)[18] are triggered; *i.e.*, the nets must extend eight feet beyond the building. As noted above, however, if temporary floors are in use, the safety net requirement of section .750(b)(1)(ii) is never triggered. In addition, even under the interpretation preferred by petitioner, there is no requirement for a perimeter net *per se*, but merely a requirement for an extension of an *interior* net. Thus, if there is no interior net in use, there can be no requirement for a perimeter net and no exterior fall protection. Furthermore, it is not clear to us that the hanging of an interior net necessarily triggers the extension requirement.[19] Section .105(c)(1) may simply mean that if exterior nets are hung then they must extend at least eight feet out.

We believe that both parties have framed the issue too broadly. The question is not whether Subpart R provides *any* exterior fall protection standards, but rather whether it provides standards to guard against the *particular exterior fall hazard* for which Willson was cited. Thus, although Willson seeks to bolster its argument by noting that section .750(b)(1)(iii)[20] provides exterior fall

17. Although it seems clear to us that a temporary floor provides no exterior fall protection to an employee working above the floored levels, we note that the Commission has held on at least one occasion that the existence of temporary floors precludes a citation for failure to provide exterior fall protection under section .105(a). *See Brennan v. OSHRC & Ron M. Fiegen, Inc.*, 513 F.2d 713 (8th Cir. 1975). The *Fiegen* case is distinguishable, however, because the endangered employee in that case was working *on* the temporary floor level, not above it.

18. Section .105(c)(1) provides in part:
(c)(1) Nets shall extend 8 feet beyond the edge of the work surface where employees are exposed and shall be installed as close under the work surface as practical but in no case more than 25 feet below such work surface....
29 C.F.R. § 1926.105(c)(1).

19. For example, it is possible that there could be a building that is not adaptable to temporary floors in which *interior* safety nets have been hung in accordance with section .750(b)(1)(ii).

If the employer provides exterior fall protection by requiring employees to use safety belts or by maintaining some other exterior fall protection, it does not seem reasonable to suggest, by reference to section .105(c)(1), that the interior nets must extend outside the building. Such an interpretation would provide two means of exterior fall protection where one would suffice. The Commission, however, has applied section .105(c) to require the extension of an interior net where no other means of exterior fall protection has been utilized. *See Daniel Construction Co.*, OSHRC No. 12525, 9 OSHC (BNA) 1854 (1981).

20. Section .750(b)(1)(iii) provides:
(b)(1)(iii) Floor periphery—safety railing. A safety railing of ½-inch wire rope or equal shall be installed, approximately 42 inches high, around the periphery of all temporary-planked or temporary metal-decked floors of tier buildings and other multifloored structures during structural steel assembly.
29 C.F.R. § 1926.750(b)(1)(iii).

protection, the point Willson seeks to make is not relevant to the question at hand. Section .750(b)(1)(iii) requires that a railing of sorts be maintained on the perimeter of the temporary flooring. Although such a railing does provide exterior fall protection for workers on that floor, it is manifest that a railing on the sixth floor level will not provide exterior fall protection to an employee on the ninth level. Willson does not suggest otherwise.

Despite the obvious flaws in the wording of section .750(b)(1)(ii), we are unable to find that the regulation is susceptible to the interpretation petitioner wishes to place upon it. The regulation simply cannot be read to provide the means by which an employer must protect against the exterior fall hazard at issue in the present case, *i.e.,* an exterior fall from a workpoint above any level where temporary floors have been installed. Because this hazard is not addressed by a specific regulation, we find that it was proper for the Secretary to issue the citation under the general construction standards found in sections .28(a) and .105 (a).

2. Substantial Evidence—The Safety Belt Violation

■ Willson argues that the citation, insofar as it is based upon a failure to utilize safety belts under section .28(a), must be vacated because the Secretary failed to present substantial evidence showing that the use of belts was feasible on the inspection date. Underlying this claim are the concededly "unusual" circumstances extant on March 24, 1980. It appears that over the weekend of March 22–23 unusually high winds twisted the steel structure and vibrated loose some of the bolt connections. Thus it is conceded, and the ALJ found, that "the unusual circumstances . . . did present conditions where employees should not have tied off their safety belts to any steel until they assured themselves that the

steel was safe to go upon . . . ." *ALJ Decision* at 15, J.A. at 213.

The Secretary argues, however, that substantial evidence supports the ALJ's further finding that "there is no acceptable explanation as to why these employees, once they went upon the steel to be tightened, did not tie off their belts." *Id.* We disagree. It is anomalous to say that the employees' exercise of judgment not to use belts precluded a violation only until a certain point in time, but not thereafter, unless there is sufficient evidence that at that certain point there was *no question* but that the employees should have used the belts.

■ The burden of proving all elements of a violation rests with the Secretary. *See* C.F.R. § 2200.73(a). In order to meet the burden in this case, the Secretary must have shown that under the conditions present on the inspection date, the use of safety belts was "appropriate." *See* 29 C.F.R. § 1926.28(a), *supra* note 4. The record shows that the compliance officer who issued the citations was at the Willson worksite for approximately one hour,[21] observed the employee on the ninth level for only ten minutes,[22] and did not herself go on the building.[23] Although another compliance officer opined that there was no reason the employees could not tie off, that individual was not at the Willson worksite on March 24th and did not observe the "unusual" circumstances.[24] In other decisions, the Commission has found that when the use of safety belts can result in additional danger to steel workers a citation for failure to use belts under section .28(a) is inappropriate. *See American Bridge Division of United States Steel Corp.,* OSHRC No. 2249, 2 OSHC (BNA) 1222 (1974); *Industrial Steel Erectors, Inc.,* OSHRC No. 703, 1 OSHC (BNA) 1479 (1974). Furthermore, the Commission apparently does not require that employers in such situations

---

21. Testimony of OSHA compliance officer Josephine Hopkins [*Hopkins Testimony*], J.A. at 59.

22. *Hopkins Testimony,* J.A. at 67.

23. *Hopkins Testimony,* J.A. at 58.

24. Testimony of OSHA compliance officer John Wiseman [*Wiseman Testimony*], J.A. at 80.

seek a variance under the procedures outlined in the Act. *See* 29 U.S.C. § 655(d). This interpretation is, moreover, consistent with the wording of section .28(a). Safety belts can hardly be "appropriate personal protective equipment" if their use itself creates a "hazardous condition." In light of these facts, we cannot find that this record presents substantial evidence to support a finding that section .28(a) was violated on March 24, 1980.

### 3. Vagueness and ambiguity in section .105(a)

Willson next claims that it lacked proper notice of the requirements imposed by the standards. This challenge is premised upon the "inconsistent, confusing interpretation attempted to be thrust upon [steel erectors] under [section] .105(a) by the enforcement authorities in the District of Columbia." Brief for Petitioner at 30. Willson's argument in this regard is limited to the portion of the citation that alleged a violation for failure to maintain perimeter netting.

The Secretary argues that Willson is required under section .105(a) to provide *continuous* fall protection by means of a combination of the fall protection methods listed therein. The Secretary thus contends that a structural steel employer is required to maintain perimeter safety nets if safety belts cannot provide fall protection *at all times*. In order for the Secretary's interpretation to prevail, we must find that the inability to use belts at all times renders them "impractical." *See* 29 C.F.R. § 1926.-105(a), *supra* note 4.

The Secretary's interpretation is entirely consistent with the well-settled principle that the Act is to be construed liberally to effectuate its purpose of "assur[ing] so far as possible . . . safe . . . working conditions . . . ." 29 U.S.C. § 651(b). *See Bristol Steel*, 601 F.2d at 721; *Southern Railway*

*Co. v. OSHRC,* 539 F.2d 335, 338 (4th Cir.), *cert. denied,* 429 U.S. 999, 97 S.Ct. 525, 50 L.Ed.2d 609 (1976). Unfortunately, this interpretation is *not* consistent with section .105(a) itself which suggests that if safety belts are practical then safety nets are not required.

Section .105(a) has been the subject of conflicting interpretations since its promulgation.[25] In an early case, the Fifth Circuit upheld the Commission's view that section .105(a) does not require safety nets if one of the devices listed therein is used, even if the device is not effective in preventing falls. *See Brennan v. OSHRC & J. W. Bounds,* 488 F.2d 337 (5th Cir. 1973) (per curiam). In another case, however, the same court rejected the Commission's construction that if any of the devices listed in the section was "practical," even if not utilized, then no safety nets were required. *See Brennan v. Southern Contractors Service,* 492 F.2d 498 (5th Cir. 1974).

In *Brennan v. OSHRC & Ron M. Fiegen, Inc.,* 513 F.2d 713 (8th Cir. 1975), some employees were working sixty-five feet above the ground on an unguarded roof, and others worked at the same level on scaffolds. The Secretary there urged that because the roof, which was considered a "temporary floor," and the scaffolds did not serve the function of preventing falls, the employer was not relieved of its duty under section .105(a) to install safety nets. The Commission reversed the citation and the Eighth Circuit upheld the Commission, reasoning that "[the] regulation, as presently formulated, does not necessarily make illegal a failure to use safety nets where employees are working on a scaffold or temporary floor, regardless of the safety features of such a floor or scaffold." *Id.* at 715. Thus the Commission has interpreted section .105(a) to mean that nets are not required if one of the devices listed therein is

25. Part 1926, including section .105(a), originally was promulgated under the authority provided by the 1969 amendments to the Contract Work Hours and Safety Standards Act. *See* 40 U.S.C. § 333 (1970). Part 1926 became a part of the OSHA standards under special summary procedures that allowed adoption of standards

that were in effect on OSHA's effective date without compliance with the requirements of the Administrative Procedure Act. *See* 29 U.S.C. § 655(a). *See Daniel Int'l Corp. v. OSHRC,* 656 F.2d 925 (4th Cir. 1981) for a discussion of the propriety of the procedures employed in promulgating Part 1926.

used, even if the device does not in fact provide fall protection. More relevant for our purposes is another case involving section .105(a) wherein the Fifth Circuit upheld a safety net citation upon a finding that the "alternative safety devices, the safety belts and lanyards, were not and could not be used during a substantial portion of the work day." *Marshall v. Southwestern Industrial Contractors and Riggers, Inc.*, 576 F.2d 42, 44 (5th Cir. 1978).

As in the cases cited above, our concern is with the term "impractical." Although urged many times to clarify the meaning of this term, the Secretary has neither sought amendment of section .105(a) nor issued any clarifying order. We agree with the *Southwestern Industrial* court that, given the interpretation of the word "impractical" to mean both "not practical" *and* "not actually used," the Secretary's position is a reasonable one, at least as a general proposition. Thus we believe that there is a point at which the amount of time during a work day that safety belts cannot be used renders them "impractical" as a means of fall protection.

The word "impractical" as used in section .105(a) is ambiguous. We do not believe that it is reasonable to interpret the standard to mean that the inability to use belts at all times, even if the period of non-use is short, renders them "impractical." This interpretation of the word "impractical" is so far from its ordinary meaning that we find it does not provide adequate notice to employers of their duties under the Act. When "the interpretation derives little support from the language of the regulation, it would be fundamentally unfair to impose upon an employer civil penalties for its violation." *Fiegen*, 513 F.2d at 716.

■ In promulgating section .105(a), the Secretary may have intended to mandate that when safety belts cannot provide fall protection at all times, perimeter nets are also required. This is not, however, what the regulation says. It is well settled that "regulations cannot be construed to mean what an agency intended but did not adequately express." *Kent Nowlin*, 593 F.2d 368 at 371. *See Diamond Roofing v. OSHRC*, 528 F.2d 645, 649 (5th Cir. 1976).

■ We find, however, that interpreting the standard to mean that the inability to use safety belts during a significant period of the work day renders them "impractical" within the meaning of section .105(a) is reasonable. In *Southwestern Industrial* the safety net violation was upheld only upon a finding that the belts could not be used during a substantial portion of the work day or "during a significant portion of [the employees'] work activities." 576 F.2d at 44–45 n.2. There was evidence in that case that the employees used belts approximately fifty percent of the time. *Id.* at 43 n.1. By contrast, in the present case the Secretary produced no evidence that demonstrated Willson's employees did not use safety belts during a substantial portion of the work day. As noted above, the inspection only lasted one hour, and the compliance officer stated that she observed the employee on the ninth level for only ten minutes.[26] This is not a case where the evidence establishes that the nature of the work precluded the use of safety belts most or even some of the time. In fact, on the initial visit, the compliance officers apparently accepted Willson's assurances that its employees could be tied off at all times because the work on this particular steel structure progressed from the inside out; thus there was always an adequate stationary object to which the employees could tie off.[27] Accordingly, while there may be some point at which safety belts become "impractical" within the meaning of section .105(a), the Secretary has not established that, under the circumstances of this case, that point was reached.

■ In addition, we note that the record shows some disagreement on this issue between the compliance officers who conduct-

---

**26.** *See supra* notes 21–22 and accompanying text.

**27.** *See Hopkins Testimony*, J.A. at 25; *Wiseman Testimony*, J.A. at 97.

ed the inspection of Willson's worksite. It is uncontested that during the initial visit in February the OSHA officers informed James Willson that if either safety belts or safety nets were utilized he would be in compliance with the Act.[28] At the hearing, however, one of the officers testified that both nets and safety belts were required.[29] This apparent conflict is presumably premised on the compliance officer's belief that it is not possible for structural steel employees to tie off at all times. Willson "should not be penalized for deviation from a standard the interpretation of which, in relationship with kindred standards, cannot be agreed upon by those who are responsible for compelling compliance with it and with oversight of the procedures for its enforcement." *Kent Nowlin Construction Co. v. OSHRC*, 593 F.2d 368, 371 (10th Cir. 1979).

■ Of course the Commission is not bound by the representations or interpretations of OSHA compliance officers. *Western Steel Manufacturing Co.*, OSHRC No. 3528, 4 OSHC (BNA) 1640 (1976). Such representations, however, are relevant in a particular case to whether an employer has adequate notice of what is required under the Act. These considerations are particularly relevant where, as in the present case, the regulations involved teeter precariously on the edge of the wall that divides adequate notice from impermissible vagueness.

■ Although we believe that the Secretary's interpretation of section .105(a) to provide the most comprehensive continuous fall protection possible is admirable, we do not believe that the standard supports the Secretary's interpretation. The Act clearly contemplates specific standards that "are to be expressed in terms of objective criteria and the performance desired." S.Rep.No. 1282, 91st Cong., 2d Sess. 7 (1970), U.S.Code Cong. & Admin.News, pp. 5177, 5184. Section .105(a) does not adequately express to employers the performance that the Secretary apparently desires, *i.e.*, nets *and* belts;

nor does it contain sufficiently objective criteria, *i.e.*, when nets are required in addition to belts, to guide employers' conduct.

If safety belts cannot be safely utilized at all times and the Secretary feels nets are required in addition to belts, the proper course is to promulgate standards setting forth those requirements. Indeed, if the peculiarities of fall protection in structural steel erection separate it from other segments of the construction industry, then the specific standards in Subpart R should address those peculiarities. Alternately, the Secretary should issue a program directive or interpretative rule to clarify a structural steel employer's duties. *See Skyline Crane Service, Inc.*, OSHRC No. 80–1622 (1981).

Accordingly, we will reiterate what other courts have said:

> If the Secretary desires by [section .105(a)] to achieve certain goals which he deems consistent with the purpose of [the Act] but which the wording of the regulation, as interpreted by the Commission, will not justify, he should amend or clarify it.

*Fiegen*, 513 F.2d at 716.

> We remind the Secretary once again ... that [the] worthy purposes [of the Act] are in danger of slipping through even the most protective judicial safety net when embodied in imprecisely worded regulations.

*Southwestern Industrial*, 576 F.2d at 45.

The final order of the Commission on the "willful" violation is reversed.

### B. The "Serious" Violation

Willson was also cited for failure to provide the required interior fall protection; the Secretary charged a serious violation of section .750(b)(2)(i).[30] The citation issued reads:

> 29 CFR 1926.750(b)(2)(i): During skeleton steel erection, a tightly planked and substantial floor was not maintained within 2 stories or 30 feet, whichever is less,

---

**28.** *See Wiseman Testimony*, J.A. at 97.

**29.** *See Wiseman Testimony*, J.A. at 91.

**30.** *See supra* note 14.

below and directly under that portion of each tier of beams on which work was being performed:

> (a) South side of building—skeleton framework was placed on the ninth level before seventh level was tightly planked, exposing employees to a fall of approximately 33 feet 9 inches, on 3/24/80.

Citation and Notification of Penalty, J.A. at 6.

 Willson attacks this citation on two grounds. First, petitioner claims that the Secretary failed to establish that an employee had been exposed to a hazard. Willson contends in this regard that fall protection is provided to its employees by means of safety belts attached to life lines and that there was therefore no fall hazard at all. Section .750(b)(2)(i), however, requires temporary flooring, not safety belts. Unlike other sections of Part 1926, this standard is clear in its requirements. If Willson believed that safety belts and life lines could provide adequate protection, the variance procedures provided by the Act should have been utilized. *See* 29 U.S.C. § 655(d).

Willson does not contest the fact that the temporary floor in its building was more than thirty-three feet below the workers and that the standard requires that it be no more than thirty feet. Rather, Willson apparently reasons that because its flooring was only three feet below the required level, the violation cannot be considered "serious." Willson's tortured logic does little to aid in the resolution of this case. A "serious" violation is expressly defined in the Act as one where there is a substantial probability of death or serious physical harm.[31] It is undisputed that such harm or death would be likely to occur should an employee be subject to a thirty-three foot fall. Accordingly, we find Willson's arguments concerning this citation meritless, and we affirm the Commission on the serious violation of section .750(b)(2)(i).

## IV.

In sum, we hold that the general safety standards contained in Part 1926 apply to the structural steel erection industry insofar as specific hazards are not addressed in Subpart R. In addition, we find that section .750(b)(1)(ii) does not address the *exterior* fall hazard that exists when an employee is working on structural steel above the levels on which temporary floors have been installed. Because this particular hazard is not addressed by the specific steel standards, we hold that a citation for failure to provide fall protection may properly be made under the general standards governing personal protective equipment and fall protection requirements.

Under the general standards, however, we find that the Secretary has failed to carry his burden of showing that the standard required Willson to use either safety belts or safety nets, or both, on the date of inspection. Insofar as the citation alleged a violation of section .28(a), the Secretary did not meet his burden of proving that, under the unusual circumstances on the inspection date, the use of belts was "appropriate." The term "impractical" contained in section .105(a) is ambiguous and does not provide adequate notice to employers that if belts cannot be worn at all times, nets must be installed. Interpreting that section to require nets if belts cannot be utilized for a "substantial" or "significant" period of time, the Secretary failed to present substantial evidence to sustain a finding of violation. The decision on the first citation is therefore reversed.

The citation for failure to provide temporary flooring in accordance with section .750(b)(2)(i) is affirmed because the standard is clear in its requirements, and the Secretary produced sufficient evidence showing violation.

The final order of the Commission is, accordingly,

*reversed in part and affirmed in part.*

---

**31.** *See* 29 U.S.C. § 666(j), *supra* note 1.