**CENTURY STEEL ERECTORS, INC., Petitioner,**

v.

**Elizabeth DOLE, Secretary of Labor, United States Department of Labor, Respondent.**

No. 88–1621.

United States Court of Appeals, District of Columbia Circuit.

Argued April 17, 1989.

Decided Oct. 3, 1989.

Richard R. Nelson II, Pittsburgh, Pa., for petitioner.

Barbara A. W. McConnell, Counsel, U.S. Dept. of Labor, with whom Cynthia L. Attwood, Associate Sol., Occupational Safety and Health Review Com'n, and Ann Rosenthal, Counsel, U.S. Dept. of Labor, Washington, D.C., were on the brief, for respondent.

Before BUCKLEY and WILLIAMS, Circuit Judges, and ROBINSON, Senior Circuit Judge.

Opinion for the court filed by Circuit Judge BUCKLEY.

BUCKLEY, Circuit Judge:

Century Steel Erectors, Inc. petitions for review of an Occupational Safety and Health Review Commission order finding Century in violation of 29 C.F.R. § 1926.105(a). That regulation requires employers to provide safety nets at workplaces more than twenty-five feet above a surface where the use of other protective devices (e.g., safety belts) is impractical. The Commission determined that Century failed to safeguard its workers from a forty-foot fall and refused to consider Century's evidence that the steel erection industry's custom and practice was not to use safety belts while performing the job involved in this case. As we conclude that the Commission erred in dismissing Century's defense based on industry practice, we reverse and remand for further consideration.

## I. BACKGROUND

On June 16, 1987, employees of Century Steel Erectors, Inc. ("Century") were dismantling a temporary overhead scaffolding structure made of steel bar joists (crossbeams) that had been tack-welded to large H-beams. The workers burned off tack welds (a process that takes only fifteen to forty seconds per weld) to remove the bar joists, moving quickly from one weld to the next. While engaged in this task, one of Century's employees plunged approximately forty feet to his death. *See Secretary of Labor v. Century Steel Erectors, Inc.,* Docket No. 87–1348, ALJ Decision and Order at 3–6 (1988) ("Order").

The next day (June 17), Compliance Officer William Draper of the Occupational Safety and Health Administration ("OSHA") inspected Century's work site, where the dismantling operation was continuing. On observing workers wearing safety belts whose lanyards were not fastened to a secure object or safety line, he directed Century's foreman to instruct the employees to "tie off" (i.e., secure) the lanyards. *Id.* at 5. *See* 29 C.F.R. § 1926.107(b) (1988) (describing lanyards).

Shortly thereafter, OSHA cited Century under 29 C.F.R. § 1926.105(a) (1988) ("section .105(a)") for failure to ensure that its employees use safety belts while burning off the welds. Section .105(a) reads:

§ **1926.105  Safety nets.**

(a) Safety nets shall be provided when workplaces are more than 25 feet above the ground or water surface, or other surfaces where the use of ladders, scaffolds, catch platforms, temporary floors, safety lines, or safety belts is impractical.

After Century contested the citation, a hearing took place before an administrative law judge ("ALJ").

The ALJ apparently accepted Draper's opinion that safety nets could not have been hung at Century's work site. Order at 5. The ALJ also acknowledged Century's "well-established safety program," which included written rules requiring employees to wear safety belts when working in a stationary position, but not when performing jobs that required mobility (e.g., removing tack welds). *Id.* at 6. Although the use of nets was not feasible and Century had complied with its own safety rules during the dismantling operation, the ALJ held that the Secretary of Labor ("Secretary") had established a prima facie case by showing that none of the fall protection devices mentioned in section .105(a) had

been used to protect workers from a fall of over twenty-five feet. *Id.* at 7–9 (citing *Brock v. L.R. Willson & Sons,* 773 F.2d 1377, 1383–84 (D.C.Cir.1985) (*"Willson III"*)). Specifically, the ALJ concluded that Century's employees had not worn secured safety belts on either June 16 or 17 while removing the bar joists and H-beams, based on evidence that Century had a policy of not requiring workers to tie off during this procedure, that the employees customarily did not do so, and that the only time the workers secured themselves was after prompting from Draper on June 17. Order at 8–9.

In response, Century maintained that it was impractical for workers engaged in removing tack welds to use safety belts. In support of this position, several experienced Century ironworkers testified that it was not industry custom and practice to "tie off" belts during the process of burning off tack welds because it deprived workers of the mobility needed to perform this task and created the danger of snagged lanyards. (*See* Hearing Transcript at 391–94 (Beton testimony); 475–76 (Weber testimony); 525–32 (Schagle testimony).)

The ALJ, however, rejected this defense. First, he determined that tying off would have been feasible because mobility would not have been unduly hampered and any snagging hazard could have been avoided by taking the same precautions used to prevent welding torch hoses from snagging. Order at 10. Second, he concluded that Century's compliance with industry custom and practice was no defense to a violation of a "specific standard" such as section .105(a). *Id.* at 11 (citing *Willson III,* 773 F.2d at 1387).

Accordingly, the ALJ found that Century had committed a "serious" violation as defined in 29 U.S.C. § 666(k)—"a substantial probability that death or serious physical harm could result" from the hazardous workplace practice. Order at 13. As the Occupational Safety and Health Review Commission ("OSHRC" or "Commission") declined to review the ALJ's decision, it became the agency's "final order" under 29

U.S.C. § 661(j). Century has petitioned for review. *See id.* § 660(a).

## II. Discussion

### A. The Legal Framework

#### 1. Section .105(a)

Pursuant to the Occupational Safety and Health Act of 1970, 29 U.S.C. §§ 651–678 (1982), the Secretary of Labor has promulgated safety regulations for the construction industry, *see* 29 C.F.R. Part 1926 (1988), which OSHRC interprets in the context of adjudications. *Willson III,* 773 F.2d at 1383. Part 1926 contains two types of regulations. Some are general, such as section 1926.28(a) ("appropriate personal protective equipment" is required "in all operations where there is an exposure to hazardous conditions"). Other regulations, by contrast, apply to specific industries (e.g., subsections .750–.752 cover steel erectors) and contain particularized requirements. *See, e.g.,* 29 C.F.R. § 1926.750(a)(1) (requirements for temporary flooring in tiered buildings). General construction safety standards apply to all industries and workplaces unless a specific standard covers the same hazard-creating "condition, practice, means, method, operation, or process." *See id.* § 1910.5(c), *construed in L.R. Willson & Sons, Inc. v. Donovan,* 685 F.2d 664, 669–70 (D.C.Cir.1982) (*"Willson I"*), and *Willson III,* 773 F.2d at 1380–81.

The regulation at issue here, section .105(a), declares that "[s]afety nets shall be provided when workplaces are more than 25 feet above the ground ... where the use of ladders, scaffolds, catch platforms, temporary floors, safety lines, or safety belts is impractical." We have often characterized this regulation as "general." *See, e.g., Willson I,* 685 F.2d at 669–70, 673, 677; *Willson III,* 773 F.2d at 1380; *Donovan v. Williams Enters., Inc.,* 744 F.2d 170, 179 (D.C.Cir.1984). The *Willson* cases have clarified the regulation's meaning and scope.

*Willson I* involved the Secretary's citation of a steel erection company under section .105(a) for failure to maintain perimeter netting outside a building under

construction. The court found that section .105(a) plainly "suggests that if safety belts are practical then safety nets are not required." 685 F.2d at 674. Interpreting the word "impractical" in section .105(a) to mean both "not practical" and "not actually used," we rejected the Secretary's attempt to read "impractical" as meaning "the inability to use belts at *all* times." *Id.* at 674–75 (emphasis added). Instead, we held that the inability to wear safety belts during a "significant period of the work day" renders them "impractical" as a fall protection measure, thereby triggering the requirement of safety nets. *Id.* at 675. We concluded that the Secretary had failed to carry his burden of proving that the employees did not use safety belts "during a substantial portion of the work day" to protect against exterior falls. *Id.*

In *Willson III*, which also involved a citation for failure to use perimeter netting, we reaffirmed that section .105(a) applied to steel erectors and required them to use safety nets to prevent exterior falls where the use of the other listed safety devices was impractical. 773 F.2d at 1381–83. We emphasized that *Willson I* had ruled only that section .105(a) did not require an employer to use safety nets where his workers wore a practical alternative device (safety belts) for a "substantial portion of the work day"; this latter test did not come into play where "the employer's failure to provide any form of fall protection" precluded the use of protective devices at any time. *Id.* at 1385–86.

Finally, we determined that section .105(a) gave employers adequate notice that it applied to the steel erection industry and required use of one of the appropriate listed devices to protect against exterior falls. *Id.* at 1386–87. Rejecting the employer's contention that the industry's practice was not to use netting in these circumstances, we remarked:

> [This argument] alludes to cases in which courts have remedied facial vagueness in OSHA standards by looking to industry custom and practice in order to derive a standard of conduct as to which the employer had notice. These courts have, however, used this practice "only when a

specific standard of expected employer conduct is proposed to be derived from a very general statutory or regulatory command." *The regulatory command of § .105(a) is specific enough so that no reference to industry practice is necessary.*

*Id.* at 1387 (citation omitted) (emphasis added).

### 2. *Burden of Proof*

■ The Secretary has the burden of proving all the elements of the OSHA violation with which an employer is charged. *Willson III*, 773 F.2d at 1383. The standard established by section .105(a) contains several elements; those that the Secretary must prove will depend on the nature of the violation described in the OSHA citation. In cases where an employer has used none of the fall protection measures listed in section .105(a) and is cited for failure to provide safety nets, the Secretary will establish a prima facie case upon showing that the employees were exposed to a fall in excess of twenty-five feet and that none of the protective measures was used. *See Willson III*, 773 F.2d at 1383 (citing *Havens Steel Co.*, 1978 O.S.H.Dec. (CCH) ¶ 22,689 at 27,385 (Rev.Comm'n 1978), *aff'd without opinion*, 607 F.2d 493 (D.C.Cir. 1979)). As the Commission noted in *Havens, id.* at 27,385 n. 7, where an OSHA citation alleges "a violation at least insofar as to safety nets," it is not necessary to "address the Secretary's burden of proof with respect to those devices other than nets." Thus, to establish a violation under such circumstances, the Secretary is under no obligation to prove that the alternative safety measures were impractical. *Southern Colo. Prestress Co. v. OSHRC*, 586 F.2d 1342, 1349–50 (10th Cir.1978).

■ The case before us is clearly distinguishable. Century was cited not for failure to erect perimeter netting (which the compliance officer had found to be infeasible), but for failure to ensure the use of safety belts. As the practicality of such use is an essential element of the particular violation charged in the OSHA citation, we conclude that in order for her to establish a

prima facie case, the Secretary must show that the use of safety belts by Century's employees while engaged in burning off the tack welds was not impractical.

### B. *Application of Section .105(a) to Century*

The Commission's order may be set aside only if it is arbitrary, capricious, an abuse of discretion, or contrary to law. 5 U.S.C. § 706(2)(A) (1982). The relevant law binding OSHRC is section .105(a), as applied in the *Willson* cases. Although the Act and related regulations should be construed liberally to fulfill the legislative aim of granting workers the safest working conditions possible, *Willson III*, 773 F.2d at 1383, OSHA may not rely on imprecisely worded regulations to impose specific requirements on employers. *Willson I*, 685 F.2d at 674, 676. If the Commission has applied the law correctly, our review will focus on whether substantial evidence in the record as a whole supports the Commission's findings. 29 U.S.C. § 660(a).

Because Century was cited for having failed to ensure its employees' use of safety belts while they were burning off tack welds, the Secretary's prima facie case must include a showing that such use was practical. If the Secretary establishes her prima facie case, Century must be given the opportunity to offer, in rebuttal, any evidence that is relevant to the question of practicality. If the employer rebuts this or any other element of her prima facie case, the Secretary bears the ultimate burden of proving, by a preponderance of the evidence, that the employer indeed violated the regulation. *See Boise Cascade Corp. v. Secretary of Labor*, 694 F.2d 584, 587 (9th Cir.1982); *Pratt & Whitney Aircraft v. Secretary of Labor*, 649 F.2d 96, 105 (2d Cir.1981).

Although the ALJ concluded that the Secretary had made out her prima facie case merely by showing that Century's employees had been exposed to a forty-foot fall (a fact not in dispute) and had not used any of the protective devices listed in the standard, Order at 9, the record confirms that the Secretary had also introduced evidence that the use of safety belts during tack weld removal operations was practical. We refer to the following exchange, at the ALJ hearing, between the Secretary's counsel and Compliance Officer Draper:

Q. With reference to Item Number 1, would you explain to the Court upon what observations you made or information you gathered during your investigation which led you to issue a violation of 1926, modified as 105–A?

A. I had the occasion to determine as the result of my investigation on the accident that an accident occurred to result in serious physical harm to an employee that had not been provided fall protection, at least in the form of safety belts with attached lanyards, with a requirement to be tied off.

. . . .

Q. And, did you believe that it was feasible to use personal protective equipment [i.e., safety belts] with reference to the work that you observed that was being performed on June 17?

A. Yes, I did.

Hearing Transcript at 97–98. Although he was asked whether the use of protective equipment was "feasible," it is clear from the context of Draper's testimony that he had concluded that the use of safety belts was "practical" within the meaning of section .105(a).

Century defended itself against the Secretary's charge by arguing that its employees had in fact used safety belts and that the Secretary had failed to establish that they had failed to do so for less than a substantial portion of the work day. Century also asserted that the Commission had acted arbitrarily, capriciously, and contrary to law in not accepting Century's evidence that it was industry custom and practice not to require employees to use safety belts while engaged in removing tack welds. We address these defenses in turn.

In support of its contention that its employees used safety belts during at least *some* periods on June 16 and 17, Century points to the ALJ's statement that "[b]elts were in fact used when employees began

dismantling larger sections of the scaffold after the bar joists and H-beams had been taken down." Order at 13. Thus, Century maintains, it was incumbent on the Secretary to prove that belts were *not* used during a "substantial portion of the work day," a burden she failed to carry. Specifically, Century contends that the Secretary introduced no direct evidence to show that the employees failed to "tie off" when the work was being performed—except for Compliance Officer Draper's brief inspection that, Century claims, is insufficient under *Willson I,* 685 F.2d at 673.

In the circumstances of this case, we cannot agree with Century that the "substantial portion of the work day" test applies because, as the ALJ found, Century did not require its employees to use *any* form of fall protection while burning off tack welds to remove the bar joists and H-beams. *See Willson III,* 773 F.2d at 1385–86. Even if safety belts were properly used at some point on June 17 and thereafter (as the passage quoted from the ALJ's Order suggests), this would have little relevance to their use *while* the joists and H-beams were being removed—the operation at issue in this case. Moreover, although the Commission's conclusion that the employees had not used safety belts was based on Draper's brief inspection, it merely confirmed the undisputed evidence that Century does not require its employees to use safety belts when removing bar joists and H-beams, that workers customarily do not tie off during this procedure (as they testified), *see* Order at 9, and that the decedent had no protection when he fell. *Id.* at 4. These findings support the ALJ's conclusion that the employees were not wearing their safety belts at all on June 16 or during those hours on June 17 when they were removing the bar joists and H-beams. *Id.* at 9.

In sum, we agree with the Commission that the Secretary established that Century's employees did not use safety belts during the relevant time frame. We now reach Century's principal contention, namely, that the Commission erred in refusing to consider the evidence of industry practice.

At the hearing before the ALJ, Century argued

> that it would not have been practical for its employees to tie off during the work operations at issue ... [because of] the need for mobility, the interference that lanyards would cause, and the custom and practice of ironworkers not to tie off in the circumstances here.

Order at 10. The ALJ concluded that Century had failed to show "that the use of tied-off safety belts would have been *infeasible,*" *id.* (emphasis added), and that as section .105(a) is a specific standard, "compliance with industry custom and practice is not a defense." *Id.* at 11 (citing *Willson III,* 773 F.2d at 1387).

On appeal, Century argues that the Commission should have considered the evidence of custom and practice. Century maintains that it was admissible under *L.R. Willson & Sons v. OSHRC,* 698 F.2d 507, 513 (D.C.Cir.1983) (*"Willson II"*), which held that the Secretary had failed to establish a violation of a "general safety regulation," section 1926.28(a), which requires employers to provide employees with "appropriate protective equipment." We stated that the Secretary had not shown that "a reasonably prudent employer familiar with the structural steel erection industry" would have protected against the hazard in the manner specified by his citation and concluded that evidence of industry practice regarding the use of safety belts was "highly probative" of their feasibility and safety. *Id.* at 513–14.

The *Willson II* court relied upon industry practice in order to give meaningful content to a general standard, 29 C.F.R. § 1926.28(a). Century claims that section .105(a) is similarly general regarding safety belts and is only specific as to safety nets. The Commission, by contrast, accepted the ALJ's ruling that "since [.105(a)] is a specific standard, compliance with industry custom and practice is not a defense." Order at 11.

We reject the Commission's conclusion. Section .105(a) appears under the caption

"Safety nets" and clearly focuses on that device, although six alternative safeguards (including safety belts) are mentioned. We have consistently referred to section .105(a) as a "general" standard. *See Willson I,* 685 F.2d at 669–70; *Williams Enters., Inc.,* 744 F.2d at 179. In *Willson III,* 773 F.2d at 1380, we again referred to section .105(a) as "a general construction standard." Later in that opinion, responding to the suggestion that industry practice did not require use of perimeter netting to protect "connectors," we stated: "The regulatory command of § .105(a) is specific enough so that no reference to industry practice is necessary." *Id.* at 1387. Earlier in the same paragraph, however, we noted that

> courts have remedied facial vagueness in OSHA standards by looking to industry custom and practice in order to derive a standard of conduct as to which the employer had notice.

*Id.* We interpret these passages, when read in the factual context of *Willson III,* to mean that the standard was "specific enough" to give the employer notice that safety nets were required where the alternative measures were impractical. When we must determine the practicality of those alternatives, however, we are faced with an area of ambiguity that has long concerned us, *see Willson I,* 685 F.2d at 675, and for which a reference to industry practice remains a useful remedy. Thus we agree with Century that section .105(a) is general insofar as it applies to those alternative measures.

■ But even if we were to conclude that the standard is specific in its entirety, industry practice would still be admissible to rebut the Secretary's prima facie case because it is relevant to an essential element the Secretary must prove, namely, that the use of safety belts by Century's employees was practical. Unfortunately, the ALJ has muddied the analysis through his persistent use of "feasible" and "infeasible" as substitutes for "practical" and "impractical." The words are not interchangeable.

As we pointed out in *Willson I,* we will not accept an interpretation of "impractical" that wanders "so far from its ordinary meaning that ... it does not provide adequate notice to employers of their duties under the Act." *Id.* Webster's Ninth New Collegiate Dictionary (1983) defines "practical" as "relating to, or manifested in practice or action: not theoretical or ideal"; and in distinguishing between "practicable" and "practical," the Dictionary explains that "PRACTICAL applies to things and to persons and implies proven success in meeting the demands made by actual living or use." On the other hand, it defines "feasible" as "capable of being done or carried out." Thus while evidence of the steel erection industry's custom and practice might well shed little light on the *feasibility* of using safety belts in the circumstances here at issue, it is clearly relevant to the question of *practicality* as reflected by the industry's actual usage.

We recognize that the Secretary may have intended a different result from the one we reach today. As we pointed out in *Willson I,* however, "[i]t is well settled that 'regulations cannot be construed to mean what an agency intended but did not adequately express.'" 685 F.2d at 675 (citation omitted). Should intention and expression not coincide here, we note once again that the Secretary remains free to amend or clarify OSHA's general regulations, or to promulgate new, specific regulations to govern the use of safety belts at construction sites generally or for the steel erection industry in particular. We have urged OSHA to do so, but it has declined our invitation. *See, e.g., id.* at 676. Indeed, in *Willson I* we noted that the standard "teeter[s] precariously on the edge of the wall that divides adequate notice from impermissible vagueness." *Id.*

III. CONCLUSION

Properly understood, our holding today is quite narrow. We conclude that when an employer is cited under section .105(a) for failure to provide a fall protection safeguard other than safety nets, the Secretary must prove that its use is practical. To

carry her burden of proof, the Secretary must consider, and overcome, the employer's evidence that such devices are "impractical," including its evidence of industry custom and practice. We express no opinion as to whether, in this particular case, the Secretary could have overcome Century's demonstration of the steel erection industry's practice. We merely hold that the Commission erred in dismissing the evidence without evaluating it. Accordingly, we reverse the Commission's decision and remand for further consideration.

*So ordered.*