763 F.2d 477
 12 O.S.H. Cas.(BNA) 1361, 1984-1985 O.S.H.D. ( 27,313
 Raymond J. DONOVAN, Secretary of Labor, Petitioner,
v.
DANIEL MARR & SON CO., Respondent.
International Association of Bridge, Structural and
Ornamental Iron Workers, and Building and
Construction Trades Department, AFL-CIO,
Intervenors.
 No. 84-1756.
 United States Court of Appeals,
First Circuit.
 Heard March 5, 1985.
Decided June 4, 1985.
 
 Domenique Kirchner, Washington, D.C., with whom Francis X. Lilly, Sol. of Labor, Frank A. White, Associate Sol. for Occupational Safety and Health, and Judith N. Macaluso, Asst. Counsel for Appellate Litigation, U.S. Dept. of Labor, Washington, D.C., were on brief, for Raymond J. Donovan, Secretary of Labor.
 Victoria L. Bor, Washington, D.C., with whom Elihu I. Leifer, Sherman, Dunn, Cohen, Leifer & Counts, Washington, D.C., Victor Van Bourg and Van Bourg, Weinberg, Roger & Rosenfeld, San Francisco, Cal., were on brief, for intervenors.
 Leo A. Reed, Norwell, Mass., for respondent.
 Before CAMPBELL, Chief Judge, TORRUELLA, Circuit Judge, and RE*, Judge.
 LEVIN H. CAMPBELL, Chief Judge.
 
 
 1
 The Secretary of Labor petitions for review under the provisions of the Occupational Safety and Health Act of 1970 ("OSHA"), 29 U.S.C. Sec. 651 et seq., of an order of the Occupational Safety and Health Review Commission ("the Commission") vacating a citation issued against Daniel Marr & Son Co. ("Marr") for an alleged violation of one of the Occupational Safety and Health Regulations promulgated by the Secretary for the construction industry. We reverse.
 
 I. FACTS
 
 2
 Respondent Marr is a Massachusetts steel erection company. In April-May 1982 Marr was erecting the steel frame of a building at the Seabrook Nuclear Power Plant in Seabrook, New Hampshire, which was to house a turbine generator. About 115 feet high, the building was to have only two floors, at heights of 50 and 75 feet.
 
 
 3
 On May 11-12, 1982, OSHA compliance officer David Berard inspected Marr's worksite in response to a complaint by the International Association of Bridge, Structural and Ornamental Ironworkers, Local Union No. 474 ("the Union") about the lack of protection against falls for employees working as "connectors." Connectors put together, in a level-by-level fashion, the steel members which form the basic skeletal frame of a building. Other employees then work on the finished section of the frame. The connectors receive pieces of steel from the crane, place them in their proper location and insert bolts to hold them in place. While carrying out this operation, they are said to hang onto the steel beams "by two legs and one arm"; theirs may be the most dangerous work in the industry.
 
 
 4
 At the time of his inspection, Mr. Berard observed four connectors working on beams 115 feet above the ground at the top of the frame. The men were not "tied off" with safety belts, as the nature of their work required them to be mobile to avoid swinging girders being placed in line by the cranes. No safety nets or other fall protection devices were located beneath, leaving them exposed to a 40-foot fall were they to topple off a beam so as to drop inside the structure (i.e., to the floor 75 feet above ground level), and to a 115-foot fall were they to drop to the outside (i.e., to the ground).
 
 
 5
 After the connectors finished a level, but not before, Marr's policy was to install interior safety nets for the other employees but, even then, not to install nets capable of intercepting exterior falls.
 
 
 6
 Mr. Berard issued citations against Marr for serious violations[1] of 29 C.F.R. Sec. 1926.105(a), for failing to protect its connectors by safety nets or equivalents on the outside of the building,[2] and of 29 C.F.R. Sec. 1926.750(b)(1)(ii), for failing to protect the connectors with safety nets or some equivalent protection on the inside portion of the structure.[3] The company contested both citations. The Union elected party status in the administrative proceedings pursuant to 29 U.S.C. Sec. 659(c) and 29 C.F.R. Sec. 2200.20(a).
 
 
 7
 In respect to the first citation, Marr contended that section 1926.105(a) was a general standard that was preempted by more specific steel erection standards contained in subpart R of the Occupational Safety and Health Regulations for Construction, 29 C.F.R. Secs. 1926.750-52, in particular by section 1926.750(b).[4] These latter standards are understood as not requiring safety nets to guard against falls to the outside of structures. Marr also argued that it had never been the practice in the steel erection industry to use exterior nets, and that the Secretary had not shown, as he should, that a reasonably prudent employer would have provided exterior nets.
 
 
 8
 The administrative law judge affirmed both citations. Marr then sought review before the Occupational Safety and Health Review Commission of the section 1926.105(a) exterior net citation only. The Commission reversed the ALJ's decision by a two-to-one vote, holding that the section 1926.105(a) standard, which applied to the construction industry generally, was inapplicable here because preempted by the more specific standards for the steel erection industry contained in subpart R of the Occupational Safety and Health Regulations, 29 C.F.R. Secs. 1926.750-52, and, in particular, by section 1926.750(b). See note 4, supra.
 
 II.
 
 9
 In deciding that exterior nets were not required, the Commission relied upon its decision in a case decided that same year, Adams Steel Erection, Inc., 1984 O.S.H.D. (CCH) p 26,976, petition for review filed, No. 84-3586 (3d Cir., Sept. 14, 1984). In Adams the Commission set out its reasons for believing that section 1926.105(a) is preempted by subpart R.[5] Addressing the Secretary's argument that subpart R was never meant to address the hazards of a fall toward the outside perimeter of a building (thus leaving in effect the general safety net provision, section 1926.105(a), see note 2, supra ), the Commission said,
 
 
 10
 The absence of a specific perimeter safety net requirement in subpart R may well have been the result of a deliberate decision by the drafters of subpart R not to require such protection because, for example, it would interfere with the steel erection process, it would negatively affect the stability of the building, it was unnecessary or it would lead to some other undesirable consequences. As the Commission observed in Daniel Construction, 9 BNA OSHC at 1858, 1981 CCH OSHD at p. 31,624, interpreting these standards as cumulative produces the "illogical" result that steel erection may be "governed by more general standards not drafted with steel erection specifically in mind." ... Accordingly it seems evident that "filling in" supposed "gaps" or "interstices" in a comprehensive regulatory scheme with general standards that were not developed for application to a particular work situation can and often will result in reversing a deliberate decision not to require certain protective measures in response to that particular situation.
 
 
 11
 Adams Steel Erection, Inc., 1984 O.S.H.D. (CCH) at 34,648-49.
 
 
 12
 The Secretary of Labor joined by the intervenor Union challenges this conclusion and urges us to reverse the Commission's ruling.
 
 III.
 
 13
 To determine whether section 1926.105(a) is preempted by the steel erection standards of subpart R, we look first at 29 C.F.R. Sec. 1910.5(c)(1) and (2) which explain how to apply the Secretary's standards:
 
 
 14
 If a particular standard is specifically applicable to a condition, practice, means, method, operation or process, it shall prevail over any different general standard which might otherwise be applicable to the same condition, practice, means, method, operation or process....
 
 
 15
 29 C.F.R. Sec. 1910.5(c)(1), and,
 
 
 16
 On the other hand, any standard shall apply according to its terms to any employment and place of employment in any industry, even though particular standards are also prescribed for that industry, ... to the extent that none of such particular standards applies....
 
 
 17
 29 C.F.R. Sec. 1910.5(c)(2).
 
 
 18
 The Secretary contends that no particular standard in subpart R is "specifically applicable" to exterior falls from perimeter beams,[6] and that, therefore, the more general standard of section 1926.105(a) mandating safety nets "when workplaces are more than 25 feet above the ground or water surface, or other surfaces" comes into play pursuant to the quoted language of 29 C.F.R. Sec. 1926.105(c)(2).[7]
 
 
 19
 We think the Secretary's application of the principles set out in 29 C.F.R. Sec. 1910.5(c)(1) and (2) to the regulations in question is persuasive. Given those principles, we have trouble with the Commissions's insistence that the specific steel erection standards preempt the more general safety net standard even in those situations where the specific standards do not apply. It is hard to square the Commission's inference in Adams of a possible "deliberate decision [through silence] not to require certain protective measures" with the statement in section 1910.5(c)(2) that "any standard shall apply ... to the extent that none of such particular standards applies...."
 
 
 20
 The Commission goes too far, moreover, when it says that it is "illogical" that steel erection "may be governed by the more general standards not drafted with steel erection specifically in mind." Adams, 1984 O.S.H.D. (CCH) at 34,649. The Secretary, who drafted the regulations on applicability of standards, plainly believes otherwise. He has construed his regulations on the applicability of standards as setting out a scheme in which particular standards supersede general ones, see, e.g., Clifford F. MacEvoy Co. v. United States, 322 U.S. 102, 107, 64 S.Ct. 890, 893, 88 L.Ed. 1163 (1944), only to the extent the particular standards are "specifically applicable." Otherwise "[t]he general safety standards complement the specific ... by filling the interstices necessarily remaining after promulgation of the specific standards." Dravo Corp. v. OSHRC, 613 F.2d 1227, 1234 (3d Cir.1980). We cannot say the Secretary's approach is unworkable, especially if those drafting the regulations assumed that this was how they were proceeding. The Fourth Circuit, like other courts, has endorsed the Secretary's approach:
 
 
 21
 It would be utterly unreasonable to expect the Secretary to promulgate specific safety standards which would protect employees from every conceivable hazardous condition. Enforcement of general safety standards in situations not covered by specific standards does not render the specific standards meaningless or unnecessary. Specific safety standards insure a minimum level of protection to employees under common conditions widely recognized as potentially hazardous as well as provide employers with a base upon which to establish an adequate safety program. While general safety standards may quite likely cover most conditions addressed by the specific standards, fairness to the employer would require the promulgation of specific safety standards where feasible.... Lacking the omniscience to perceive the myriad conditions to which specific standards may be addressed, however, the Secretary, in an effort to insure the safety of employees as required by the Act must at times necessarily resort to the general safety standards.
 
 
 22
 Bristol Steel & Iron Works, Inc. v. OSHRC, 601 F.2d 717, 721 n. 11 (4th Cir.1979) (citations omitted).
 
 
 23
 As already noted, section 1926.105(a) of the construction industry standards states that,
 
 
 24
 Safety nets shall be provided when workplaces are more than 25 feet above the ground or water surface, or other surfaces where the use of ladders, scaffolds, catch platforms, temporary floors, safety lines or safety belts is impractical.
 
 
 25
 By its terms, this standard applies to the particular hazard described in the citation issued against Marr under this section, i.e., a fall of more than 25 feet toward the exterior of the Turbine # 2 building. As the Secretary says, whether this standard is preempted by the steel erection standards of subpart R depends on whether any of the latter is "specifically applicable" to the same condition under section 1910.5(c)(1). The most likely candidate for this is section 1926.750(b)(1)(ii) which provides,
 
 
 26
 On buildings or structures not adaptable to temporary floors, and where scaffolds are not used, safety nets shall be installed and maintained whenever the potential fall distance exceeds two stories or 25 feet. The nets shall be hung with sufficient clearance to prevent contacts with the surface of structures below.
 
 
 27
 Because this standard is not expressly limited to falls toward the interior part of a building or structure, it might be read to require safety nets on the exterior, too (in which event the Secretary's insistence on such nets could perhaps be supported by this regulation without reference to section 1926.105(a) ). The Secretary, however, has interpreted the quoted provision to refer solely to interior falls, relying on the D.C. Circuit's opinion in L.R. Willson & Sons, Inc. v. Donovan, 685 F.2d 664 (D.C.Cir.1982) ("Willson I"). In Willson I, the court considered a citation issued against an employer in the steel erection industry for failure to protect his employees adequately against an exterior fall hazard by the use of a safety net under section 1926.105(a) and by requiring that the employees wear safety belts under section 1926.28(a).[8] To the employer's contention that the hazard of an exterior fall was addressed by section 1926.750(b)(1)(ii) and that therefore the application of other construction industry standards was preempted, the court said,
 
 
 28
 Section .750(b)(1)(ii) mentions only temporary flooring, scaffolds, and safety nets as fall protection devices. In theory at least, section .750(b)(1)(ii) could be read to require temporary flooring (in accordance with section .750(b)(2)(i) ) to protect against interior falls and scaffolds to protect against exterior falls. Under this view, where there are no temporary floors and no scaffolds in use, the requirement that "safety nets shall be installed" presumably would mean both interior and perimeter nets to provide protection for both types of falls. Such an interpretation is untenable, however, because section .750(b)(1)(ii) apparently requires an absence of both temporary floors and scaffolds before requiring nets. The standard appears simply to list the methods of interior full protection in the order of preference: temporary floors, scaffolds, and finally, safety nets.
 
 
 29
 In any event, by the express terms of the standard, safety nets are required only if temporary flooring cannot be used and scaffolds are not in use. Thus, it is clear that an employer is in complete compliance with sections .750(b)(2)(i) and .750(b)(1)(ii) if temporary floors are maintained at the levels required in those sections. Accordingly, it appears obvious that temporary flooring protects only against interior falls; the standards do not require that such flooring extend beyond the perimeter of the structure.
 
 
 30
 Willson I, 685 F.2d at 671-72 (footnotes omitted).
 
 
 31
 We conclude that section 1926.750(b)(1)(ii) is not "specifically applicable" to the exterior fall hazard. It follows, as the Willson I court also held, that section 1926.105(a) is not preempted by section 1926.750(b)(1)(ii). Id. at 673. Other cases have reached a similar conclusion. See Donovan v. Williams Enterprises, Inc., 744 F.2d 170, 179 (D.C.Cir.1984) (citation under section 1926.105(a) not preempted); L.B. Willson & Sons, Inc. v. OSHRC, 698 F.2d 507, 511-12 (D.C.Cir.1983) ("Willson II") (citation under section 1926.28(a) not preempted); Bristol Steel Iron Works, Inc. v. OSHRC, 601 F.2d at 722 (citation under section 1926.28(a) not preempted).
 
 
 32
 The cases relied on by the Commission in Adams, i.e., Daniel International Corp. v. Donovan, 705 F.2d 382 (10th Cir.1983); Builders Steel Co. v. Marshall, 622 F.2d 367 (8th Cir.1980); McLean-Behm Steel Erectors, Inc. v. OSHRC, 608 F.2d 580 (5th Cir.1979); United States Steel Corp. v. OSHRC, 537 F.2d 780 (3d Cir.1976), do not address the issue at hand and are distinguishable.[9] We find no other standard in subpart R which could be considered as addressing the hazard of an exterior fall. Section 1926.750(b)(1)(iii)[10] which requires that a railing be provided on the perimeter of the temporary flooring might be deemed to provide exterior fall protection for employees doing work on that floor, but not for connectors working on beams above that level. See Willson I, 685 F.2d at 664. It is significant that, although the Commission held in Adams that section 1926.105(a) was preempted by section 1926.750(b)(1)(ii), it interpreted the latter as not requiring the use of perimeter nets when temporary floors are installed. Id. at 1984 O.S.H.D. (CCH) at 34,649.
 
 
 33
 The Commission's interpretation, therefore, cannot be sustained. Not only is the Secretary's construction more in keeping with his own regulations on applicability of standards and with court precedent, we have recently held that where there is a difference between the Secretary's interpretation of his own safety regulations and the Commission's, the Secretary's interpretation, if reasonable, is entitled to the deference commonly accorded to an agency's interpretation of its own regulations. Donovan v. A. Amorello & Sons, Inc., No. 84-1568, 761 F.2d 61, 63 (1st Cir.1985). This does not mean that a persuasive interpretation by the Commission will give way to a marginal interpretation by the Secretary; but where, as here, the Secretary's reading comports logically and reasonably with the language of his regulations, and the Commission's view seems, if not insupportable, at least strained, there can be little choice as to which reading we must accept. We accordingly reject the Commission's ruling that section 1926.105(a) does not apply so as to justify the citation issued for failure to provide safety nets protecting against outside falls.
 
 IV. REASONABLE MAN STANDARD
 
 34
 Marr contends that, even if section 1926.105(a) is applicable, the Secretary failed to shoulder a further burden, which, according to Marr, he had to assume, namely, to show that a reasonable prudent employer, familiar with the requirements of fall protection in the steel erection industry, would have protected against the hazards in the manner specified in the citation.
 
 
 35
 The Secretary, however, was under no such burden here. The case of Cape & Vineyard Division v. OSHRC, 512 F.2d 1148 (1st Cir.1975), applying such a test, involved a different kind of regulation. We faced there an amorphous standard mandating protective equipment "wherever it is necessary by reason of hazards ... encountered in a manner capable of causing injury ... through physical contact." We held,
 
 
 36
 A regulation without ascertainable standards, like this one, does not provide constitutionally adequate warning to an employer unless read to penalize only conduct unacceptable in light of the common understanding and experience of those working in the industry.
 
 
 37
 Id. at 1152. (We qualified the above by noting that there might be unusual instances where industry practice had failed to take reasonable precautions against known hazards and where "it might not be unfair to hold the employer to a standard higher than that of actual practice." Id. )
 
 
 38
 The above principles are not involved here. While "general" in the sense that it applies throughout the construction industry, section 1926.105(a) is quite specific in other respects:[11] safety nets are to be provided when the workplace is more than 25 feet above the ground and where other safety measures are impractical.[12] There is no necessity to refer to industry practice to ascertain what is required. See A.E. Burgess Leather Co. v. OSHRC, 576 F.2d 948, 951 (1st Cir.1978); Desarrollos Metropolitanos, Inc. v. OSHRC, 551 F.2d 874, 877 (1st Cir.1977); Faultless Division v. Secretary of Labor, 674 F.2d 1177, 1185-87 (7th Cir.1982).
 
 
 39
 Finally, Marr complains that the failure to provide exterior nets was not raised by the Secretary during previous inspections of the Seabrook Nuclear Power Plant construction site. An employer cannot, however, rely on the Secretary's failure to issue citations. See Cedar Construction Co. v. OSHRC, 587 F.2d 1303, 1306 (D.C.Cir.1978). Cf. Heckler v. Chaney, --- U.S. ----, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985) (decision by administrative agency not to pursue enforcement action is presumptively unreviewable).
 
 
 40
 We accordingly grant the petition for review and reverse the decision of the Commission.
 
 
 41
 So ordered.
 
 
 
 *
 Chief Judge, of the United States Court of International Trade, sitting by designation
 
 
 [1]
 A serious violation is defined as one where
 there is a substantial probability that death or serious physical harm could result from a condition which exists, or from one or more practices, means, methods, operations, or processes which have been adopted or are in use, in [the] place of employment unless the employer did not, and could not with the exercise of reasonable diligence, know of the presence of the violation.
 29 U.S.C. Sec. 666(k).
 
 
 [2]
 29 C.F.R. Sec. 1926.105(a) provides:
 Safety nets.
 (a) Safety nets shall be provided when workplaces are more than 25 feet above the ground or water surface, or other surfaces where the use of ladders, scaffolds, catch platforms, temporary floors, safety lines, or safety belts is impractical.
 
 
 [3]
 29 C.F.R. Sec. 1926.750(b)(1)(ii) provides,
 (ii) On buildings or structures not adaptable to temporary floors, and where scaffolds are not used, safety nets shall be installed and maintained whenever the potential fall distance exceeds two stories or 25 feet. The nets shall be hung with sufficient clearance to prevent contacts with the surface of structures below.
 
 
 [4]
 This section provides,
 (b) Temporary flooring--skeleton steel construction in tiered buildings. (1) (i) The derrick or erection floor shall be solidly planked or decked over its entire surface except for access openings. Planking or decking of equivalent strength, shall be of proper thickness to carry the working load. Planking shall be not less than 2 inches thick full size undressed, and shall be laid tight and secured to prevent movement.
 (ii) On buildings or structures not adaptable to temporary floors, and where scaffolds are not used, safety nets shall be installed and maintained whenever the potential fall distance exceeds two stories or 25 feet. The nets shall be hung with sufficient clearance to prevent contacts with the surface of structures below.
 (iii) Floor periphery--safety railing. A safety railing of 1/2-inch wire rope or equal shall be installed, approximately 42 inches high, around the periphery of all temporary-planked or temporary metal-decked floors of tier buildings and other multifloored structures during structural steel assembly.
 (2)(i) Where skeleton steel erection is being done, a tightly planked and substantial floor shall be maintained within two stories or 30 feet, whichever is less, below and directly under that portion of each tier of beams on which any work is being performed, except when gathering and stacking temporary floor planks on a lower floor, in preparation for transferring such planks for use on an upper floor. Where such a floor is not practicable, paragraph (b)(1)(ii) of this section applies.
 (ii) When gathering and stacking temporary floor planks, the planks shall be removed successively, working toward the last panel of the temporary floor so that the work is always done from the planked floor.
 (iii) When gathering and stacking temporary floor planks from the last panel, the employees assigned to such work shall be protected by safety belts with safety lines attached to a catenary line or other substantial anchorage.
 
 
 [5]
 In Adams, the Commission overruled its earlier decision in Williams Enterprises, Inc., 1983 O.S.H.D. (CCH) p 26,542, aff'd, Donovan v. Williams Enterprises, Inc., 744 F.2d 170 (D.C.Cir.1984), holding that because falls toward the outside perimeter of a structure were not addressed by the standards of Subpart R, they did not preempt other standards addressing this hazard
 
 
 [6]
 Section 1910.5(c)(1) requires that the standard be specifically applicable to "a condition, practice, means, method, operation or process." While these words are not defined, they are virtually identical to ones used in the definition of a serious violation in 29 U.S.C. Sec. 666(k), where they connote a kind of occupational hazard. See note 1, supra. Thus, a plausible reading of section 1910.5(c)(1) is that for a particular standard to preempt other standards, it must be specifically applicable to the kind of hazard in question. See L.R. Willson & Sons, Inc. v. Donovan, 685 F.2d 664, 672 (D.C.Cir.1982) ("Willson I") ("The question is not whether subpart R provides any exterior fall protection standards, but rather whether it provides standards to guard against the particular exterior fall hazard for which [the employer] was cited.")
 
 
 [7]
 In Adams, the Commission implied that section 1926.105(a) could not complement the standards of subpart R because it "cannot be described as a general standard designed to fill interstices left by promulgation of specific standards," being itself "a specific standard addressing fall hazards." Adams, 1984 O.S.H.D. (CCH) at 34, 646 n. 4. The Commission thus seemed to believe that the rules of construction expressed in 29 C.F.R. Sec. 1910.5(c)(1) and (2) apply only to "general standards," whatever that rather loose term means. But section 1910.5(c)(2), at least, contains no such limitation. That section provides that "any standard shall apply according to its terms to any employment and place of employment in any industry...." (Emphasis supplied.) It is not contested that section 1926.105(a) by its terms applies to the hazards of an exterior fall
 
 
 [8]
 This section provides,
 The employer is responsible for requiring the wearing of appropriate personal protective equipment in all operations where there is an exposure to hazardous conditions or where this part indicates the need for using such equipment to reduce the hazards to the employees.
 
 
 [29]
 C.F.R. Sec. 1926.28(a)
 
 
 [9]
 These cases limit themselves to reaffirming the general proposition that when section 1926.750(b)(1)(ii) applies to a particular hazard it preempts the application of other general construction industry standards. But the question in this case is precisely whether the hazard of an exterior fall is addressed by section 1926.750(b)(1)(ii) or any other of the standards of subpart R
 
 
 [10]
 This section provides,
 (b)(1)(iii) Floor periphery-safety railing. A safety railing of 1/2-inch wire rope or equal shall be installed, approximately 42 inches high, around the periphery of all temporary-planked or temporary metal-decked floors of tier buildings and other multifloored structures during structural steel assembly.
 
 
 [29]
 C.F.R. Sec. 1926.750(b)(1)(iii)
 
 
 [11]
 Compare, e.g., section 1926.28(a), supra note 8
 
 
 [12]
 Marr has not contended that the use of other safety devices besides perimeter nets is feasible in this case. Quite the opposite, it has argued that the use of safety belts impairs the mobility of the connectors. Thus, this is not a case like Willson I, 625 F.2d 664, where a citation requiring the use of exterior nets under section 1926.105(a) was reversed by the court because the Secretary had failed to prove that safety belts were not a practical method of protection, contrary to the allegations of the employer