**SPANCRETE NORTHEAST, INC., Petitioner,**

v.

**OCCUPATIONAL SAFETY AND HEALTH REVIEW COMMISSION, Respondent.**

No. 722, Docket 89–4111.

United States Court of Appeals, Second Circuit.

Argued Jan. 25, 1990.

Decided May 22, 1990.

Harry R. Hayes, III, Albany, N.Y. (Hayes & Hayes, Albany, N.Y., of counsel), for petitioner.

Charles F. James, Atty., U.S. Dept. of Labor Office of the Sol. Washington, D.C. (Robert P. Davis, Sol. of Labor, Cynthia L. Attwood, Associate Sol. for Occupational Safety and Health, Ann Rosenthal, Counsel for Appellate Litigation, Washington, D.C., of counsel), for respondent U.S. Dept. of Labor.

Before VAN GRAAFEILAND, MINER and WALKER, Circuit Judges.

VAN GRAAFEILAND, Circuit Judge:

Spancrete Northeast, Inc. petitions for review of that part of an Occupational Safety and Health Review Commission order which held that Spancrete's failure to require its employees to use safety belts while grouting the second floor of a building under construction violated section 5(a)(2) of the Occupational Safety and Health Act of 1970, 29 U.S.C. § 654(a)(2), and more specifically a construction standard promulgated pursuant thereto, 29 C.F.R. § 1926.500(d)(1). For the reasons that follow, we vacate that portion of the Commission's order.

At the time the alleged violation occurred, Spancrete, a manufacturer and erector of precast concrete, was installing precast concrete slabs to form the second floor of the Heritage of Norwood health care facility in Norwood, New Jersey. The company installed the slabs in a two-stage process. In the first stage, a crew of five or six men, with the help of a crane, placed the slabs on masonry walls and steel beams so as to form the floor. The second stage involved the grouting with cement of the narrow gaps, or "keyways", between the slabs after they were set in place. This process also required a five-man crew. One worker transported the cement from a ready-mix truck to the work area in a wheelbarrow. Two men, using buckets, poured the grout into the keyways. Two others smoothed the joint areas with squeegees attached to wooden handles some five to six feet in length. Of necessity and pursuant to specific instructions, the workers who poured the grout near the outer edges of the slabs did so from a crouched position in which they faced towards the edge of the platform. The men who smoothed the grout near the outer edges of the slab also faced the platform edge as they manipulated their squeegees.

Section 1926.500(d)(1) reads as follows:

(d) *Guarding of open-sided floors, platforms, and runways.* (1) Every open-sided floor or platform 6 feet or more above adjacent floor or ground level shall be guarded by a standard railing, or the equivalent, as specified in paragraph (f)(1)(i) of this section, on all open sides, except where there is entrance to a ramp, stairway, or fixed ladder. The railing shall be provided with a standard toeboard wherever, beneath the open sides, persons can pass, or there is moving machinery, or there is equipment with which falling materials could create a hazard.

Section 1926.500(f) contains the specifications for a "standard railing." Paragraph f(1)(i) simply states the minimum requirements for standard railings made of wood. Safety belts are not the "equivalent" of standard railings within the meaning of section 1926.500(d)(1). *Warnel Corp.,* 1975–76 O.S.H.D. ¶ 22,576 (March 31, 1976).

On October 18, 1988, Leonard Drew, an OSHA inspector, issued the following citation with respect to Spancrete's grouting procedures:

| Standard, Regulation or Section of the Act Violated | Description | Date by Which Violation Must Be Abated | Penalty |
|---|---|---|---|
| 29 CFR 1926.500(d)(1): Open-sided floors or platforms, 6 feet or more above adjacent floor or ground level, were not guarded by a standard railing or the equivalent on all open sides:<br>a) The heritage of Norwood. First floor was not provided with guard rails to prevent employee(s) falling 11'4" to the ground below while grouting pre-cast slabs on 10/14/88. | | Immediately Upon Receipt | 200.00 |

When Spancrete contested this citation, the Secretary of Labor issued a complaint based thereon. The complaint alleged in pertinent part that Spancrete had committed a serious section 17(k) (29 U.S.C. § 666(k)) violation of 29 C.F.R. § 1926.500(d)(1) in that the floor on which Spancrete's employees were grouting "was open-sided and was not provided with guardrails on the open sides" and the employees engaged in the grouting worked near the open unguarded sides and could have fallen 11 feet, 4 inches to the ground.

During the hearing that followed service of Spancrete's answer, the Secretary produced only one witness, Inspector Drew. Drew proved to have a very limited knowledge of general grouting procedures. He had no prior experience with precast concrete and had only inspected one precast construction job prior to Spancrete's. He did not observe Spancrete's employees while they were grouting, and his testimony concerning the grouting and the construction environment in which it was performed was sparse and in some respects erroneous. The exhibits and testimony introduced by Spancrete, none of which is contradicted, illustrate this very well.

The Heritage of Norwood building under construction was octagonal in shape. It was the core building of a larger structure with six wings extending out from the core.

Spancrete's job was to lay the second floor of only the core building and about 1,600 square feet of one wing, "Wing C." The outside walls of the core building were of solid masonry construction, and the outer edge of Spancrete's precast slabs rested directly on the masonry. In the core building, the interior edges of the slabs rested on steel girders that were supported by steel posts spaced around the interior of the floor area. Some forty of these posts extended above the floor area to furnish support for the roof and the interior walls. Because of the building's unusual shape, the distances between the outer masonry walls and the nearest upright posts varied between eight feet and sixteen feet. In Wing C, both ends of the concrete slabs rested on bearing walls, and there were no upright projecting posts.

Richard Thornburg, Spancrete's vice president, testified that there were about 100 outer keyway edges that required grouting and that "it would be a matter of just a few seconds" for the grouting on each outer edge to be performed. He testified further that the total time for grouting all outer edges was probably no more than fifteen minutes. Thornburg, who had twenty-four years of experience in precast operations, also testified that he knew of no precast erector in the United States who installed guardrails for the protection of its

workmen and that it was not standard industry practice to install them.

Spancrete's other witness, Morgan Wildey, was Spancrete's erection foreman. Wildey testified that he had been employed by Spancrete for twenty-two years, that he had not erected a perimeter guard in all that time, and that no one ever had fallen off a building. In his opinion, there was no danger of this occurring.

In the face of this testimony, Drew's recommendations for safety measures were anything but persuasive. One of these, that Spancrete build a two-story scaffold around the entire 400–foot perimeter of the building, seemed almost like a throw-away recommendation. There was no testimony as to the time, expense and danger involved in erecting and dismantling such a scaffold, except Thornburg's categorical statement that it would not have been economically feasible to construct it. The ALJ mentioned scaffolding only in passing and obviously did not give it serious consideration. In view of the fact that Spancrete's workmen could grout the entire floor in approximately four hours and would spend only about fifteen minutes of this time near the unguarded perimeters, the ALJ's adverse reaction to the scaffold suggestion was to be expected.

Equally without merit was Inspector Drew's suggestion that a wooden railing could be constructed by stringing two-by-fours between "Adjustable Safety Rail Brackets," four foot uprights with a clamping device on the bottom. According to a brochure that Drew offered in evidence, these brackets fasten like a vice on the edges of floor slabs and the steel beams upon which the slabs rest. One lip of the clamp, approximately six to eight inches long, is inserted underneath the steel beam, and the other lip, apparently the same length, is clamped to the top of the slab. Because the floor slabs in the Heritage of Norwood building rested on solid masonry walls, there were no steel beams under which the lower lip of the bracket could be inserted. Moreover, the uprights to which the two-by-fours would be attached are fastened to the inner end of the bracket's

upper lip and thus are at least six to eight inches in from the edges of the concrete slabs. The toeboards required by section 1926.500(d)(1) are attached at the bottom of these uprights. It is quite apparent that it would be impossible for workmen to grout the keyways behind the toeboards and beneath the clamps. The ALJ also recognized that the hazard of setting the brackets and railing might pose a greater hazard than was presented by the unguarded grouting. In short, wooden railings constructed by using the Adjusted Safety Rail Brackets would not be a feasible safety measure for the grouters.

As an alternative to wooden railings, Drew suggested a railing consisting of one-half inch wire strung between the above-described steel posts. Drew at first testified that the posts to which the wire was to be attached were located "mostly around the edge, the perimeter" and that "cables could have been run from beam to beam around the perimeter." On further cross-examination, Drew said, "I don't know if they were at the perimeters [sic] edge, but they were, I believe, a few feet from the end." He finally acknowledged that he didn't remember. As already has been pointed out, the posts that were closest to the building edge were eight feet back, and the next closest were sixteen feet back. There was no way that wire strung between these posts could have served as a perimeter guardrail, and this suggestion too was considered infeasible.

Having envisioned the one-half inch wire strung between the "perimeter" posts, Drew apparently was loath to abandon the idea. Although he had never seen precast erectors wearing safety belts while setting slabs or grouting, Drew recommended that Spancrete's grouters be required to wear them, with lanyards connecting the belts to wires strung between the "perimeter" steel posts. Although it may be assumed that the ALJ adopted this suggestion, his order, which was adopted by the Commission, stated simply, and without methodological detail, that safety belts are to be used for all grouting done within ten feet of the perimeter of the floor. It is from this

portion of the order that Spancrete petitions for review.

## DISCUSSION

■ Our review on this appeal is limited to the validity of the ground upon which the Commission's order rested. *General Electric Co. v. OSHRC*, 583 F.2d 61, 63 n. 6 (2nd Cir.1978); *General Electric Co. v. OSHRC*, 540 F.2d 67, 68 n. 1 (2nd Cir.1976) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 87, 63 S.Ct. 454, 459, 87 L.Ed. 626 (1943)). Spancrete was charged with violating section 1926.500(d)(1) which requires open-sided floors to be guarded with standard railings or their equivalent. That was the charge specified in the citation, as required by section 9(a) of OSHA (29 U.S.C. § 658(a)), and in the Secretary's complaint, as required by 29 C.F.R. § 2200.35(b)(1). The Secretary might have charged in the alternative that Spancrete should have protected its employees against perimeter falls by providing them with "personal protective equipment" as provided for in 29 C.F.R. § 1926.28(a). *See, e.g., Carlyle Compressor Co. v. OSHRC*, 683 F.2d 673, 674 (2nd Cir.1982); *Brock v. Dun–Par Engineered Form Co.*, 843 F.2d 1135, 1136 (8th Cir.1988); *Voegele Company v. OSHRC*, 625 F.2d 1075, 1077 (3rd Cir.1980). No such charge was made. Neither did the complaint allege a violation of the general duty clause, 29 U.S.C. § 654(a)(1). The Secretary apparently was satisfied that her allegation of a section 1926.500(d)(1) violation was sufficiently broad to include an uncharged section 1926.28(a) violation. We disagree.

The general duty clause, 29 U.S.C. § 654(a)(1), requires that each employer furnish his employees with work and a working environment that is "free from recognized hazards." Section 654(a)(2) requires that each employer "comply with occupational safety and health standards promulgated" by the Secretary of Labor. Compliance with the requirements of specific section 654(a)(2) standards is intended to be the primary method by which employee safety is assured. *Usery v. Marquette Cement Mfg. Co.*, 568 F.2d 902, 905 n. 5

(2nd Cir.1977). Evidence that a feasible, specific section 654(a)(2) standard has been violated is all that is necessary to establish liability.

Where the violation of a general duty clause is alleged, due process requires something more. To impart the necessary specificity to a general duty provision, this Court "requires the OSHRC to determine whether a reasonable man familiar with the conditions of the industry would have instituted the protective measure which the Commission claims the alleged violator failed to implement." *Pratt & Whitney Aircraft, Division of United Technologies Corp. v. Secretary of Labor*, 649 F.2d 96, 106 (2nd Cir.1981) (citing *American Airlines, Inc. v. Secretary of Labor*, 578 F.2d 38, 41 (2nd Cir.1978)).

■ Section 1926.28(a) makes the employer responsible for requiring the wearing of "appropriate" personal protective equipment such as safety belts where hazards exist. Section 1926.28(a) was promulgated as a standard under 29 U.S.C. § 654(a)(2). However, because of section 1926.28(a)'s lack of specificity and the generality of its language, it has been analogized to a section 654(a)(1) general duty provision. *Voegele Company, Inc. v. OSHRC, supra*, 625 F.2d at 1078; *Bristol Steel & Iron Works, Inc. v. OSHRC*, 601 F.2d 717, 722 (4th Cir.1979); *see General Electric Co. v. OSHRC, supra*, 540 F.2d at 69–70. The test of "appropriateness" is treated as an objective one, based on what a reasonable man familiar with industry practices would have done.

■ The Secretary has the burden of pleading the violation of section 1926.28(a). *See* 29 C.F.R. § 2200.35(d). She also has the burden of proving the violation, *i.e.*, that safety belts should have been used because, under the conditions of the particular case, such use would have been "appropriate." *L.R. Willson & Sons, Inc. v. Donovan*, 685 F.2d 664, 673 (D.C.Cir.1982); *Power Plant Division v. OSHRC*, 590 F.2d 1363, 1365 (5th Cir.1979). Although industry practices are not controlling, (*but see S & H Riggers & Erectors v. OSHRC*, 659 F.2d 1273, 1283 (5th Cir.1981)), evidence of

such a practice is pertinent on the issue of whether the employer in a particular case determined appropriateness in a reasonable manner. *See American Airlines, Inc. v. Secretary of Labor, supra*, 578 F.2d at 41; *Ray Evers Welding Co. v. OSHRC*, 625 F.2d 726, 732 (6th Cir.1980). Thus, industry practice might tend to show that grouters are accustomed to working on unguarded floors and therefore would be safer without safety belts because they exercise particular care when near the perimeter of the floors, always facing the perimeters while they work. *See, e.g., R.L. Sanders Roofing Co. v. OSHRC*, 620 F.2d 97, 100–01 (5th Cir.1980). As stated in *Ray Evers Welding Co., supra,* "negligence on the part of a whole industry cannot be lightly presumed." *Id.* at 732.

In the instant case, the Secretary has attempted to escape the burdens thus imposed upon her by alleging only a violation of section 1926.500(d)(1) and making the sole issue concerning safety belts that of feasibility rather than appropriateness. Secretary's Brief at 9–10. However, feasibility and appropriateness are entirely different concepts. "Feasible" means "possible" or "capable of being done." *American Textile Mfrs. Inst., Inc. v. Donovan*, 452 U.S. 490, 508–09, 101 S.Ct. 2478, 2490, 69 L.Ed.2d 185 (1981). *Webster's Third New International Dictionary* 831. "Appropriate" means "fit", "proper", or "suitable." *Id.* at 106. The case of *Brock v. Dun–Par Engineered Form Co., supra,* 843 F.2d 1135, upon which the Secretary places heavy reliance, deals with the issue of feasibility, not appropriateness. Until the latter is answered in the affirmative, the former need not be reached. If the Secretary had charged Spancrete with a violation of section 1926.28(a), she would have had to prove that the use of safety belts was appropriate or reasonable. She should not be permitted to escape this burden by alleging only a violation of section 1926.500(d)(1). This is particularly so where, as here, the evidence concerning appropriateness is anything but substantial. If section 1926.28(a), on personal protective equipment, has been held so general that due process requires some reference

to reasonableness and industry custom before liability is imposed, we believe that the same is required where the Secretary attempts to use section 1926.500(d)(1)—which says nothing about personal protective equipment—to address a failure to employ safety belts.

■ Mr. Drew, the Secretary's sole witness, lacked the experience to testify as an expert on the grouting of precast concrete and could not speak to the customary practices in the industry. He had inspected only one other precast concrete job, and he had never seen any precast erectors wearing safety belts while grouting. He at no time observed Spancrete's employees in the process of grouting. Under 29 C.F.R. § 1926.104(b) lifelines for safety belts "shall be secured above the point of operation to an anchorage or structural member capable of supporting a minimum dead weight of 5,400 pounds." The ALJ made no finding as to how or where the lifelines could be attached in the instant case, and it may be assumed that he adopted Mr. Drew's suggestion that the lifelines could be cables strung between the posts that Drew mistakenly believed were near the floor's perimeter. Not only were the posts in question not near the floor's perimeter and thus "above the point of operation," wires connecting them would not be universally parallel to the perimeter of the octagon-shaped core building. In some cases, the outer edge of the floor would run at an angle of 40–45 degrees to the proposed safety cable. Assuming that the existing posts would not be suitable as anchorages, there was no evidence whatever concerning whether other structural members capable of supporting a dead weight of 5,400 pounds could be attached to the precast concrete slabs for the short period of time that perimeter grouting was going on without causing permanent damage to the slabs. This was a matter of particular significance with respect to the use of safety belts in Wing C where there were no upright posts.

■ Mr. Wildey, Spancrete's foreman, testified that the use of safety belts would create a hazard of tripping or falling. The

ALJ dismissed this testimony as speculation, since Mr. Wildey never had used safety belts while grouting. Having rejected Wildey's testimony as speculative, the ALJ proceeded to speculate on his own to the effect that the use of safety belts would not rise to the level of a greater hazard, an opinion that is not shared universally. *See Ray Evers Welding Co. v. OSHRC, supra,* 625 F.2d at 732–33; *Eagle Sheet Metal, Inc.,* 1979 O.S.H.D. ¶ 23,598 (May 1, 1979); *Crouch–Walker Corp.,* 1979 O.S.H.D. ¶ 23,227 (November 9, 1978). "Reasonableness is an objective test which must be determined on the basis of evidence in the record." *Ray Evers Welding Co. v. OSHRC, supra,* 625 F.2d at 732. The ALJ's findings should be based on testimony from knowledgeable witnesses experienced in the technical area involved, not upon the ALJ's subjective feelings unsupported by the record. *L.R. Willson and Sons, Inc. v. OSHRC,* 698 F.2d 507, 513 (D.C.Cir.1983); *Cape and Vineyard Division v. OSHRC,* 512 F.2d 1148, 1153 (1st Cir.1975).

In sum, we hold that it was error to impose liability upon Spancrete because of the absence of safety belts, without any reference whatever to 29 C.F.R. § 1926.28(a), and this error was not cured by the insubstantial evidence presented to the ALJ. Since it appears that Spancrete is following a practice widely adopted in the precast concrete industry, the Secretary should have no difficulty in finding other instances in which the appropriateness of using safety belts can be determined under proper charges and with adequate proof. Accordingly, we think it inadvisable to remand the instant case for further proceedings. The petition for review of that portion of the Commission's order dealing with the use of safety belts and imposing a $200 penalty is granted and that portion of the order is vacated.