07-1251-cv
In re City of New York

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term, 2007

Argued: January 23, 2008                    Decided: March 27, 2008

Docket No. 07-1251-cv

_____

In re: CITY OF NEW YORK, as owner and operator of the
M/V ANDREW J. BARBERI,

*Petitioner-Appellant,*

—v.—

SHIRAM AGNI, et al.,

*Respondent-Third-Party-Plaintiffs-Appellees*,

—v.—

IRIS WEINSHALL, et al.,

*Third-Party-Defendants-Appellants*.

_____

Before:

SACK, KATZMANN, and RAGGI,
*Circuit Judges*.

Appeal from February 26, 2007 judgment following a bench trial on a stipulated record denying the City of New York's petition for limitation of liability stemming from a crash involving the Staten Island Ferry (E.D.N.Y., Korman, *J.*). Because we conclude that the standard of reasonable care requires at least two crewmembers on watch in or near the pilothouse and that the City failed to enforce a policy that would meet this standard of care, the judgment of the district court is affirmed and the case is remanded.

_____

WAYNE D. MEEHAN (Gina Venezia, *of counsel*) Freehill Hogan & Mahar LLP, New York, New York, *for Petitioner-Appellant*.

JAMES E. RYAN, Dougherty Ryan Giuffra Zambito & Hession, New York, NY (John J. Hession, Jeffrey S. Moller, Anthony Bisignano, *of counsel*), *for Respondents-Third-Party-Plaintiffs-Appellees*.

_____

KATZMANN, *Circuit Judge*:

This case arises out of the Staten Island Ferry's crash into a maintenance pier on October 15, 2003. It calls on us to determine whether the City of New York's practice of allowing the Staten Island Ferry to be operated with only a single pilot in the pilothouse necessarily meets the standard of reasonable care as a matter of law. The City, as owner and operator of the ferry, appeals from a decision of the district court for the Eastern District of New York (Korman, *J.*), rendered after a bench trial, finding the City negligent and denying limitation of liability. For the reasons stated below we affirm, holding that the City did not act with reasonable care when it allowed a single pilot to operate the Staten Island Ferry without at least one other person in or near the pilothouse, aware of the navigational circumstances, and ready to render or summon assistance in the event of an emergency.

I

The *M/V Andrew J. Barberi* was one of several large passenger ferries owned and operated by the New York City Department of Transportation between Whitehall Terminal at the southern tip of Manhattan and St. George Terminal, Staten Island. The ferry was 310 feet long

and displaced 2712 long tons.[1]  It could carry up to 6000 passengers, but on the day of the accident it was carrying an estimated 1500 people.  The ferry's typical speed at full ahead was 16 knots (about 18 miles per hour) and sea trials revealed that it could come to a full stop from that speed in about 420 feet and within 43 seconds.  The *Barberi* was a double-ended ferry with a pilothouse containing steering and throttle controls at each end.  The ferry was equally suited to traveling in either direction, thus avoiding the need to turn around after leaving or before entering its slip.

On October 15, 2003, at about 3:00 p.m., the *Barberi* left Manhattan on its regularly scheduled 22-minute trip across New York Harbor's Upper Bay to Staten Island.  Although it was windy (about 25 to 30 knots), the weather was clear and presented no problems for the ferry.  The ferry was under the command of Captain Michael Gansas, but for this trip Assistant Captain Richard Smith was at the helm.  In addition to being licensed captains, both the captain and assistant captain were certified as first-class pilots, as required by Coast Guard regulations.  Both had more than a decade of experience with the Staten Island Ferry and had consistently received good performance reviews.  Gansas, who had no reservations about Smith's abilities to pilot the ferry, was not in the operative pilothouse for this trip; he spent the trip in the aft pilothouse preparing for an upcoming Coast Guard inspection.  Smith was accompanied in the operative pilothouse by a deckhand, Joseph Selch, who was assigned as a lookout for the trip.  Selch later told investigators that he noticed no problems with Smith and they had a normal conversation during the trip.  Senior Mate Robert Rush was also in the pilothouse for the second half of the

---

[1] One long ton equals 2240 pounds, so the ferry displaced 6,095,040 pounds or 3047 short (or U.S.) tons.

-3-

trip, but he had no assigned duties with respect to navigating the ship on this trip and was seated on the settee, a low-slung bench at the rear of the pilothouse, where he had no view of the navigational situation out the pilothouse windows.

As the ferry reached the Kill Van Kull Buoy off the north end of Staten Island, about 1000 yards (or half a mile) from the St. George Terminal, Smith released Selch from his lookout duties so that he could go assist in preparations for docking. As Selch left the pilothouse, Smith stood up at the controls, as was his custom. The ferry was traveling at its normal speed, approximately 14-16 knots, as it passed the buoy. At this speed, it would take about two minutes to reach the slip at St. George Terminal. On typical trips, the ferries would begin to slow down at the buoy, but on this trip the crew and passengers told investigators that they did not hear the engines slow down.

Shortly after Selch left the pilothouse, Smith "lost conscious or situational awareness." The ferry went off course and crashed at full speed into a concrete maintenance pier about 600 yards south of the slip at the St. George Terminal. Smith remembers nothing from the time Selch left the pilothouse until the crash. Doctors later determined that his condition was caused by fatigue. Rush, who was still seated on the settee, recalled Smith standing up at the controls, but did not notice anything amiss until he felt the ship crash and then heard Smith exclaim, "Jesus." The impact tore a 210-foot-long gash in the starboard side of the hull on the main-deck level and destroyed about 1500 square feet of the pier. Ten passengers were killed. Nineteen passengers were seriously injured, one of whom died two months later. Fifty-seven passengers suffered minor injuries.

Smith was 55 years old and was on several prescription medications for high blood pressure, high cholesterol, insomnia, and chronic back pain. On the day of the accident Smith reported to work exhausted. The day before he had been working around the house and babysitting for his grandchildren. His chronic back problems were causing him difficulty sleeping and during that night he took some prescription drugs for his back pain. At work the next morning, he failed to report his fatigue or any of his medical conditions or medications to Gansas (or anyone else), and, in fact, had previously falsely stated on a required Coast Guard form that he had no medical conditions and did not take any medication.

On August 4, 2004, Smith pleaded guilty to eleven counts of seaman's manslaughter in violation of 18 U.S.C. § 1115, for negligently causing the deaths of passengers, and to one count of making false statements to the Coast Guard in violation of 18 U.S.C. § 1001(a)(2). In his allocution, Smith admitted that he was criminally negligent in operating the ferry without reporting his poor physical condition and the medications that he had taken that morning. Smith was sentenced primarily to 18 months' imprisonment.

Patrick Ryan, the City's director of ferry operations at the time, was also indicted on eleven counts of seaman's manslaughter and several counts of making false statements and obstruction of justice. On April 25, 2005, he pleaded guilty to seaman's manslaughter for allowing the ferries to be operated in a criminally negligent manner by not enforcing the City's internal "two-pilot rule" that "generally required the captain and assistant captain to be together in the operating pilot house while the [ferry was] underway," and to making false statements to the Coast Guard about his practices when he was a ferry captain. Ryan was sentenced to one year and one day in prison.

On December 1, 2003, the City initiated an action seeking to limit its liability as owner and operator of the ferry pursuant to the Limitation of Liability Act, 46 U.S.C. §§ 30505, 30511. All other actions were enjoined and over 175 claimants (including the appellees) asserted personal-injury and wrongful-death claims against the City in the limitation action. After the district court denied the claimants' motion for summary judgment, the parties agreed that the limitation issue would be decided by Judge Korman based on a stipulated record and without a live trial.

In a detailed opinion dated February 26, 2007, the district court denied the City's petition to limit its liability. *In re City of New York*, 475 F. Supp. 2d 235 (E.D.N.Y. 2007). The district court found that the cause of the accident was that the assistant captain, Smith, who was piloting the ferry, lost conscious or situational awareness in the brief period after he had released the lookout, but before docking the vessel, and that the accident could have been avoided if the captain, Gansas, had been present in the pilothouse with Smith. The district court also found that Ryan, the City's director of ferry operations, was negligent for failing to enforce a two-pilot rule or otherwise to guard against the foreseeable risk of pilot incapacitation, and that his negligence was a substantial cause of the accident. The City was therefore not entitled to limit its liability because the negligent acts that caused the casualty were within the City's privity or knowledge.

This appeal followed.

II

It has long been the rule in this circuit that we review a district court's factual findings for clear error, but we review its ultimate conclusion of negligence *de novo*. *Payne v. United States*,

-6-

359 F.3d 132, 134-35 (2d Cir. 2004); *Ching Sheng Fishery Co. v. United States*, 124 F.3d 152, 157-58 (2d Cir. 1997).

A panel of this Court recently questioned our Circuit's continued adherence to the *de novo* standard of review for questions of negligence in the face of nearly unanimous disagreement by the other circuits and commentators, all of whom would apply a more deferential standard. *Payne*, 359 F.3d at 135-36. But the panel in *Payne* declined to refer the issue to the Court *en banc* because the outcome of that case did not turn on the standard of review. *Id.* at 135. Likewise in this case, because we would affirm the district court's finding of negligence on either a *de novo* or clear error standard of review,[2] we do not deem this case to be a suitable one to consider calling for *en banc* reconsideration.

We note only that the practice in our Circuit is not so different from that of the other circuits. Because the determination of negligence is so bound up with the specific and complex facts of each individual case, we have stated on more than one occasion that "the trial court's 'finding should ordinarily stand unless the court manifests an incorrect conception of the applicable law.'" *Esso Standard Oil S.A. v. S.S. Gasbras Sul*, 387 F.2d 573, 580 (2d Cir. 1967) (quoting *Radovich v. Cunard Steamship Co.*, 364 F.2d 149, 152 (2d Cir. 1966)); *see also Cleary v. U.S. Lines Co.*, 411 F.2d 1009, 1010 (2d Cir. 1969) (per curiam). And even circuits that apply the clearly erroneous standard to negligence findings will apply a *de novo* standard when considering "whether the district court properly defined the standard of care used to evaluate the conduct of the parties." *In re Paducah Towing Co.*, 692 F.2d 412, 422 (6th Cir. 1982); *see, e.g.*, *Clement v. United States*, 980 F.2d 48, 53 (1st Cir. 1992) (noting in negligence case that *de novo*

---

[2]Because we affirm the district court's finding of negligence under the *de novo* standard, it follows *a fortiori* that we would affirm under the clear error standard.

review applies if district court applied erroneous legal standard to the facts); *Miller v. United States*, 587 F.2d 991, 994 (9th Cir. 1978) ("Our review of what standard of conduct should have been utilized in a negligence finding is a legal question."). The ultimate determination of negligence is a question that contains both factual and legal aspects, *see* 9 *Moore's Federal Practice* § 52.34(1)(a) (3d ed. 2007); although appellate courts may differ in their exact formulations, most appear to take an approach that gives more deference to the trial judge when the question is predominantly factual and less deference when the question is predominantly legal. *Cf. United States v. Selioutsky*, 409 F.3d 114, 119 (2d Cir. 2005) ("We review . . . mixed questions of law and fact either *de novo* or under the clearly erroneous standard depending on whether the question is predominantly legal or factual." (internal citations omitted)).

III

The Limitation of Liability Act limits the owner of a vessel's liability for, among other things, "any loss, damage, or injury by collision . . . done, occasioned, or incurred without the privity or knowledge of the owner," to "the value of the vessel and pending freight." 46 U.S.C. § 30505(b). The statute therefore alters the normal rules of vicarious liability. Instead of being vicariously liable for the full extent of any injuries caused by the negligence of the captain or crew employed to operate the ship, the owner's liability is limited to the value of the ship unless the owner himself had "privity or knowledge" of the negligent acts. *See, e.g.*, *Carr v. PMS Fishing Corp.*, 191 F.3d 1, 4 (1st Cir. 1999); *Tug Ocean Prince, Inc. v. United States*, 584 F.2d 1151, 1155, 1159 (2d Cir. 1978). Where the owner of a ship is a corporation, the corporation is not entitled to limit its liability "where the negligence is that of an executive officer, manager or

superintendent whose scope of authority includes supervision over the phase of the business out of which the loss or injury occurred." *Coryell v. Phipps*, 317 U.S. 406, 410 (1943). Thus the City is not entitled to limit its liability if Director of Ferry Operations Patrick Ryan's admitted failure to enforce a "two-pilot rule," requiring the captain and assistant captain to be in the operative pilothouse while the ship is underway, constituted negligence that was causally connected to the crash.

Under admiralty law, the owner of a ship in navigable waters owes a duty to its passengers to exercise "reasonable care under the circumstances." *Kermarec v. Compagnie Generale Transatlantique*, 358 U.S. 625, 632 (1959). The City argues that reasonable care does not require two pilots in the pilothouse at all times and therefore Ryan's admitted failure to enforce a policy requiring two pilots was not negligent. Counsel for the claimants conceded at oral argument that reasonable care might not always require two pilots in the pilothouse, but the claimants nevertheless argue that the City was negligent here because it took *no* steps to mitigate the risk of sudden pilot incapacitation. Thus we must engage in the familiar common-law task of determining the standard of reasonable care under the circumstances of this case. As we explain below, we believe that strict enforcement of nothing less than a two-pilot rule, which essentially requires two licensed captains to be in the pilothouse at all times, would exceed the standard of reasonable care. But we find that the standard of care embodied in a Coast Guard regulation applicable to similarly sized ships carrying a similar number of passengers, which essentially calls for at least one person other than the pilot to be on watch in or near the pilothouse, accurately reflects the minimum safety precautions that the City must take under the circumstances of this case. Because Ryan failed to enforce not only a strict two-pilot rule but *any*

policy that would meet even this minimum applicable standard of care, we find that the negligence was within the privity or knowledge of the City.

In determining what the standard of reasonable care requires, we are mindful of the formula first stated by Judge Learned Hand in *United States v. Carroll Towing Co.*, 159 F.2d 169, 173 (2d Cir. 1947): whether the burden of adequate precautions (B) is less than the gravity of the injury (L) discounted by the probability that the injury will occur (P), *i.e.*, whether $B<PL$.

The gravity of the potential injury if a ferry carrying more than a thousand commuters were to crash at full speed is well illustrated by the harm actually done in this case—the loss of eleven lives, injuries to many more, and substantial property damage.

The burden to the City of taking adequate precautions is relatively small. The district court determined that enforcing a two-pilot rule requiring Gansas to be in the pilothouse with Smith at all times would have avoided the accident because Gansas could have taken control of the ship once he noticed that Smith was incapacitated. The Staten Island Ferry already employed two licensed captains for the *Barberi,* as it was required to do by Coast Guard regulations,[3] so the cost of the additional precaution in this case would not have involved hiring another licensed officer. Instead, the cost is reflected in whatever activity the second captain would have to forgo while the ship is underway in order to be in the pilothouse—in this case, for example, Gansas was preparing for a Coast Guard inspection during the trip so that preparation would have to be

---

[3]The Coast Guard certificate of inspection for the *Barberi* specified that the ferry must, at a minimum, carry at least two officers with first-class-pilot certifications. While the certificate of inspection indicates the minimum complement of officers and crew considered necessary for safe operation, *see* 46 C.F.R. § 15.103, it does not specify where the crewmembers should be stationed or what their duties should be while the ship is underway. It is worth noting that the Staten Island Ferry had ample crew; Senior Mate Robert Rush was even able to ride out the second half of the trip on the settee without any assigned duties.

done at another time or by another employee—and by any displeasure felt by the City's employees at the inconvenience of having to be present in the pilothouse at all times. On balance, the burden to the City of having a second person in or near the pilothouse at all times is relatively small.

The probability that the injury would occur in this case—that the pilot would become suddenly incapacitated at a crucial moment and remain incapacitated long enough for the ship to crash into something—is very small. But the risk, while small, is undoubtedly foreseeable. The City freely admits that it was aware of the possibility that a pilot could become suddenly incapacitated, just as any reasonable person would be aware of that possibility. Nevertheless, the City submits that sudden incapacitation is a foreseeable risk that we accept all the time in myriad contexts without demanding stringent precautions. For example, every day millions of people drive cars without first ensuring that there is someone who will take the wheel if they are suddenly incapacitated. And the City points out that in other forms of mass transportation, such as buses and trains, we generally accept the risk that a driver could be suddenly incapacitated without ensuring that a second driver is waiting, ready at the controls to take over. Surely the risk of death is at least as great with a bus traveling at 70 miles per hour on a crowded highway as with a ferry traveling 18 miles per hour in a harbor. Yet we do not require two drivers on a bus.

It is true that in many contexts we do not consider the risk of sudden incapacitation to be an unreasonable one. *See, e.g.*, W. Page Keeton et al., *Prosser and Keeton on Torts* § 31 at 170 (5th ed. 1984) ("No person so much as rides a horse without some chance of a runaway, or drives a car without the risk of a broken steering gear or a heart attack. But these are not unreasonable

risks."). But whether the risk of sudden incapacitation is considered unreasonable depends very much on context. "For this reason, it is usually very difficult, and often simply not possible, to reduce negligence to any definite rules; it is 'relative to the need and the occasion,' and conduct which would be proper under some circumstances becomes negligence under others." Keeton, *supra*, § 31 at 173 (quoting *Babington v. Yellow Taxi Corp.*, 250 N.Y. 14, 18 (1928) (Cardozo, C.J.)).

In short, our analysis under the Hand formula leads us to compare a relatively small burden of adequate precautions with a very small risk of great harm. These factors are, of course, difficult to quantify and weigh against one another. Judge Hand's test is really more of an analytic framework than an actual formula into which we could plug rough numerical estimates of burdens and injuries, and our abstract comparison of the factors is inconclusive. Fortunately, we need not reason from a blank slate in applying the Hand formula; we can look to guideposts like industry custom and government regulations in determining the standard of care for a large ferry like the *Barberi*.

Custom or standard practice in the industry is a useful measure in assessing the standard of care. *See, e.g.*, *In re Air Crash Disaster at John F. Kennedy Int'l Airport*, 635 F.2d 67, 77 (2d Cir. 1980). Courts will not lightly presume an entire industry negligent. *Spancrete Northeast, Inc. v. Occupational Safety & Health Review Comm'n*, 905 F.2d 589, 594 (2d Cir. 1990). As Judge Hand explained, however, "in most cases reasonable prudence is in fact common prudence; but strictly it is never its measure; a whole calling may have unduly lagged in the adoption of new and available devices. . . . [T]here are precautions so imperative that even their universal disregard will not excuse their omission." *The T.J. Hooper*, 60 F.2d 737, 740 (2d Cir.

-12-

1932).  In *The T.J. Hooper*, the Court found that even though it was not general practice in the industry for tugs to carry radios capable of receiving weather reports, a tug that lost a barge to rough weather at sea without a functioning radio was negligent and unseaworthy.  *Id.*

In this case, industry custom does not provide a ready answer.  The City argues that standard practice in the industry is to operate ferries with only one pilot in the pilothouse when conditions permit and points to several examples of ferry operators both in and outside of New York (as well as other types of vessels operating in New York Harbor) who require only one licensed officer in the pilothouse at all times.  The claimants, on the other hand, point to the Washington State Ferry System, the largest ferry operator in the United States, as an example of a ferry system that requires the presence of two qualified people in the pilothouse (a licensed deck officer and a quartermaster) at all times that the ferry is underway.  We do not find either side's argument on industry custom to be dispositive.  None of the ferries identified by the City is truly comparable in size or passenger capacity to the *Barberi*.  And while the precautions taken by the one ferry operator with ships comparable to the Staten Island Ferry may be prudent, these practices have not become universal enough to suggest an industry custom.

Governmental safety regulations can also shed light on the appropriate standard of care.  In fact, when a defendant has violated a safety regulation causing an injury, courts will find the defendant *per se* negligent, the theory being that the legislature or agency has already determined what precautions need to be taken.  *See* Restatement (Third) of Torts: General Principles § 12 (1999); Keeton et al., *supra*, § 36; *see also Michelsen v. Penney*, 135 F.2d 409, 419 (2d Cir. 1943).  Courts often will defer to the judgments of legislatures and agencies when they have spoken because they are institutionally better situated to set safety standards.  These same

principles underlie many forms of judicial deference to agency action. *Cf. United States v. Mead Corp.*, 533 U.S. 218, 228-29, 234-35 (2001); *Auer v. Robbins*, 519 U.S. 452, 461 (1997); *Chevron U.S.A. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984); *Skidmore v. Swift & Co.*, 323 U.S. 134, 139-40 (1944). As the Supreme Court has recently noted, federal agencies are often better positioned to set standards of care than are common-law courts. *See Riegel v. Medtronic Inc.*, 128 S. Ct. 999, 1008, 1011 (2008) (noting that juries applying the common law lack the expertise of agencies and finding common-law-negligence claims challenging the safety of a medical device approved by the FDA preempted to the extent the claims were not based on a negligence *per se* theory stemming from violation of federal law).

Keeping these principles in mind we look to the agency charged with establishing maritime safety regulations—the U.S. Coast Guard. 14 U.S.C. § 2. The Coast Guard has promulgated a pilothouse watch regulation providing that "[i]n addition to the licensed deck officer or pilot, there shall be at least one member of the crew on watch in or near the pilothouse at all times when the vessel is being navigated." 46 C.F.R. § 78.30-5. This safety regulation applies to Subchapter H "passenger vessels," that is, vessels of at least 100 gross tons that carry more than twelve passengers for hire. 46 C.F.R. § 70.05-1(a). As the Southern District of New York noted in an early case dealing with the predecessor of 46 C.F.R. § 78.30-5, one of the purposes of the pilothouse watch regulations is "to cover any emergency caused by the sudden disability of the pilot." *The Scandinavia*, 11 F.2d 542, 545 (S.D.N.Y. 1918). While this may not be the only (or even the primary) purpose of the pilothouse watch regulation, the presence of an additional person attuned to the situation of the ship serves to reduce the risk of harm from sudden incapacitation.

-14-

This is not a case of negligence *per se* because the pilothouse watch regulation does not technically apply to the Staten Island Ferry: as a free ferry, it does not carry passengers for hire within the meaning of the regulation. The claimants' own expert witness recognized as much, stating in his affidavit: "Admittedly this particular regulation may not have been technically enforceable with regard to the operation of the BARBERI because the passengers rode the ferry for free at the time and were therefore not technically 'passengers for hire.'" Therefore, if the Staten Island Ferry's practices did not comply with the pilothouse watch regulation, this failure would not constitute negligence *per se*. *See, e.g.*, *Salinero v. Pon*, 177 Cal. Rptr. 204, 212 (Cal. Ct. App. 1981) (no negligence *per se* where statutory violation not established).

But the content of the regulation can still be indicative of the degree of care that would be reasonable under the circumstances. *See, e.g.*, Keeton et al, *supra*, § 36 at 231. While it may not technically apply to the ferry, the pilothouse watch regulation does apply to ships of the *Barberi*'s size engaged in similar operations. The distinction between paying and non-paying passengers on a municipal ferry has no rational connection to the safety precautions that are appropriate. Thus it is fair to say that the pilothouse watch regulation reflects the standard of care that the Coast Guard—the agency charged with regulating maritime safety, *see* 14 U.S.C. § 2—believes is appropriate for ferries of the *Barberi's* size carrying the same number of passengers. While we, as a court exercising common-law judgment, may have difficulty drawing the line between small vessels that can safely be operated by a single person and large passenger vessels whose size and complexity require more than one person attuned to the navigational situation for safe operation, the Coast Guard has the resources and expertise to make such a determination.

-15-

The pilothouse watch regulation does not reflect the standard of care that the claimants urge us to adopt—it does not require two pilots to be in the pilothouse at all times while the ship is underway—but it does require that a second crewmember be "on watch in or near the pilothouse." 46 C.F.R. § 78.30-5. We hold that the standard of care embodied in the pilothouse watch regulation requires that, in addition to the pilot, at least one other person in or near the pilothouse be paying attention to the navigational situation of the ship, thereby being ready to render or summon assistance in the event of an emergency such as the incapacitation of the pilot. Certainly compliance with the pilothouse watch regulation would not have imposed an undue burden on such a large and well-manned ship as the *Barberi*, and it would have reduced the chances of a devastating casualty in the event of an emergency like the sudden disability of the pilot. As the Coast Guard has determined that it is appropriate for ships of the *Barberi*'s size and passenger capacity to adopt such safety precautions, we hold that reasonable care would require the Staten Island Ferry to adopt them as well.

IV

It is clear from the district court's factual findings that the Staten Island Ferry did not comply with the standard of care embodied in the pilothouse watch regulation. After Smith released his lookout, Deckhand Selch, to assist in the docking procedure, he was the only person in or near the pilothouse aware of the ferry's navigational situation. True, Senior Mate Rush was present in the pilothouse seated on the settee, but the record does not support a finding that he was on watch. The district court found that Rush had no assigned duties in the pilothouse and was not involved in navigating the ship. From where he was seated, Rush had no view of the

-16-

ferry's navigational situation and he noticed nothing amiss until after the crash. It is evident that no crewmember besides Smith was paying attention to the navigational situation because no one noticed that the ship was far off course until moments before the ferry crashed at full speed into the pier. Had a second person in or near the pilothouse been paying attention to navigational situation as the ferry passed the Kill Van Kull Buoy and failed to slow down, there may have been time to summon Gansas, revive Smith, or take other action to prevent or minimize damage before the allision.

This negligence was within the privity or knowledge of the City. Patrick Ryan, the City's director of ferry operations, stated in his plea allocution that the City's written standard operating procedures for the Staten Island Ferry contained a "two-pilot rule" that generally required the captain and assistant captain to be together in the operative pilothouse while the ferry was underway.[4] Ryan stated that the rule "served to insure passenger safety by providing for at least two people in the operating pilothouse aware of the navigational situation." And Ryan admitted

---

[4]The precise status and content of the City's standard operating procedure are unclear and that lack of clarity as to content and processes precludes the kind of judicial deference that might otherwise obtain when an agency proceeds deliberatively, following established regulatory procedures. Rather than a concise manual, the standard operating procedures appear to have been a diffuse series of directives on practices and procedures assembled informally in a handout that was never properly distributed. Because the written version of the standard operating procedures that the City contends were in effect at the time of the accident (contained in an undated, eight-page document) was insufficiently authenticated, the district court found "only that there was an operative [standard operating procedure] that contained the two-pilot rule." There is some ambiguity as to whether the two-pilot rule in the standard operating procedures required the captain and assistant captain to be together in the operative pilothouse *at all times*. Ryan stated in his allocution that two pilots were "generally" required—language that might admit of some exceptions—and the City points to language in the unauthenticated standard operating procedure suggesting that the captain had discretion to utilize the crew as he saw fit. But we see nothing in the record to suggest that the standard operating procedures sought to provide for anything less than two people aware of the navigational situation in or near the pilothouse—the minimum precautions reflected in the pilothouse watch regulation.

that this rule was not properly disseminated or enforced and he was aware that it was not being observed on all ships in good weather. While a two-pilot rule may have exceeded the standard of reasonable care, the City had no other policy in place to ensure that the standard of care embodied in the pilothouse watch regulation was being observed. The captain of the *Barberi* was under the impression that he had the discretion to leave the assistant captain alone in the pilothouse if, in his judgment, conditions permitted. The Coast Guard regulations put the City on notice of the practices that the Coast Guard believed were necessary for the safe operation of a ship of the *Barberi*'s size and passenger capacity. And yet the City failed to properly train its captains or enforce a policy that would ensure that at least two people in or near the pilothouse were aware of the navigational situation at all times.

Because Ryan's negligent failure to enforce an adequate policy was within the privity and knowledge of the City, the City is not entitled to limit its liability under 46 U.S.C. § 30505. The judgment of the district court is **AFFIRMED** and the case is **REMANDED** for further proceedings not inconsistent with this opinion.